1
2
3
4
5
6
7
8                  UNITED STATES DISTRICT COURT
9                  CENTRAL DISTRICT OF CALIFORNIA
10
11
12   DAVID LYONS,                    )    Case No. CV 14-00605-DMG (KK)
13                     Plaintiff,    )
                                      )
14          v.                        )    FINAL REPORT AND
                                      )    RECOMMENDATION OF UNITED
15   CAROLYN W. COLVIN, Acting        )    STATES MAGISTRATE JUDGE
     Commissioner of Social Security, )
16                                    )
                      Defendant.      )
17   _____ )

18          This Final Report and Recommendation is submitted to the Honorable Dolly M.

19   Gee, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07

20   of the United States District Court for the Central District of California.  Plaintiff David

21   Lyons seeks review of the final decision of the Commissioner of the Social Security

22   Administration ("Commissioner" or "Agency") denying his applications for Title II

23   Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income

24   ("SSI").  For the reasons stated below, the Commissioner's decision should be affirmed

25   and this action should be dismissed with prejudice.

26   ///

27   ///

28
                                        1

# I.

## PROCEDURAL BACKGROUND

On August 4, 2010, Plaintiff filed separate applications for DIB and SSI. Administrative Record ("AR") at 138-47, 160. On February 2, 2011, the Agency initially denied Plaintiff's applications. Id. at 76-79. The applications were subsequently denied upon reconsideration on July 14, 2011. Id. at 84-89.

On November 28, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 91. On October 15, 2012, a hearing was held before ALJ Mary L. Everstine. Id. at 45-71. On November 23, 2012, the ALJ issued a decision denying Plaintiff's applications. Id. at 20-38.

On December 10, 2012, Plaintiff asked the Agency's Appeals Council to review the ALJ's decision. Id. at 17-18. On December 17, 2013, the Appeals Council denied Plaintiff's request for review. Id. at 1-5.

On January 27, 2014, Plaintiff filed the instant action. ECF No. ("dkt.") 1. On January 13, 2015, pursuant to the Court's Case Management Order, see Dkt. 7, the parties filed a Joint Stipulation ("Jt. Stip."). Dkt. 19.

On May 8, 2015, the Court issued a Report and Recommendation that the Commissioner's decision should be affirmed and this action should be dismissed with prejudice. Dkt. 21. On May 22, 2015, Plaintiff filed Objections to the Report and Recommendation. Dkt. 22. On June 5, 2015, the Commissioner filed a Response to Plaintiff's Objections. Dkt. 25. The Court herein issues a Final Report and Recommendation, addressing Plaintiff's Objections on pages 40-41.

# II.

## RELEVANT FACTUAL BACKGROUND

Plaintiff was born on October 21, 1959 and his alleged disability onset date ("AOD") is March 4, 2009. AR at 138. Plaintiff alleges disability based upon: (1) pulmonary embolism; (2) deep vein thrombosis; (3) migraine headaches; and (4) acute mental illness and/or depression. Id. at 164. Plaintiff was 49 years old at the time of the

AOD, and 52 years old at the time of the hearing before the ALJ.  Plaintiff has at least a high school education, is able to communicate in English, and last worked in 2009 as a salesman.  Id. at 165-66.  Plaintiff previously worked in a variety of sales positions and in truck delivery.  Id. at 31.

**A.      Plaintiff's Psychiatric Admission to Hillmont Psychiatric Unit**

From May 30, 2010 to June 9, 2010, Plaintiff was admitted to the Hillmont Psychiatric Unit at Ventura County Medical Center due to severe depression and suicidal ideation resulting from the loss of his home, job, car, and financial resources.  Id. at 413-15.  Plaintiff complained of migraine headaches and had previously been diagnosed with major depressive disorder.  Id. at 413.  Plaintiff was treated with medication and discharged to a homeless shelter after his condition improved.  Id. at 414.  Plaintiff was advised to continue his medication, follow-up with an outpatient psychiatrist, and see an outpatient medical doctor for attention.  Id.

**B.      Treating Sources**

**1.      Treating Sources at Ventura County Behavioral Health, Mental Health Services**

On June 10, 2010, Plaintiff was referred to Ventura County Behavioral Health ("VCBH"), Mental Health Services and was subsequently treated by several sources.  Id. at 270.

**a.      Dr. Josefina M. Sta. Romana**

Dr. Josefina M. Sta. Romana, M.D., was one of Plaintiff's treating psychiatrists at VCBH.[1]  Id. at 248.  On June 16, 2010, Dr. Sta. Romana treated Plaintiff and signed a statement in support of Plaintiff's "Disability Identification Card Application" for discounted fare on Gold Coast Transit.  Id. at 184, 255.

On July 29, 2010, Dr. Sta. Romana signed a note stating Plaintiff was under his

---

[1]     It is unclear from the record exactly when Dr. Sta. Romana began treating Plaintiff and when Dr. Sta. Romana stopped treating Plaintiff.

1   care and was "unable to work at this time." Id. at 248.

2           **b.    Dr. Jantje Groot**

3           Dr. Jantje Groot, M.D., was one of Plaintiff's treating psychiatrists at VCBH.  Id.

4   at 258.  Dr. Groot appears to have first treated Plaintiff in September 2010.  Id.  On

5   September 2, 2010, Dr. Groot met with Plaintiff and recorded her observations in a

6   document titled "Progress Note."  Id.  Dr. Groot reported Plaintiff was depressed, living

7   in a homeless shelter, and that Plaintiff felt he could not work.  Id.  Dr. Groot diagnosed

8   Plaintiff as suffering from major depressive disorder, in partial remission.  Id.  Dr. Groot

9   also stated Plaintiff was applying for SSDI benefits and speculated Plaintiff's application

10  "may play some unconscious part in maintaining a sick role."  Id.  Dr. Groot advocated

11  treatment to "reduce depression with [a] long-term goal of returning to work."  Id.  Dr.

12  Groot recommended Plaintiff take anti-depressants—specifically, Celexa, Trazosone, and

13  Wellburtin.  Id.

14          On December 13, 2010, Dr. Groot met with Plaintiff and recorded her observations

15  in a document titled "Progress Note."  Id. at 339.  Dr. Groot reported Plaintiff stated he

16  was doing better, had no depression, and had more energy.  Id.  Plaintiff stated his anti-

17  depressant medication had been giving him energy and that he was hopeful he would

18  soon gain housing and his SSDI application would be approved.  Id.  While Dr. Groot

19  believed Plaintiff appeared to be "coming out of his depression," Dr. Groot recommended

20  Plaintiff continue taking anti-depressants.  Id.

21          On February 14, 2011, Dr. Groot met with Plaintiff and recorded her observations

22  in a document titled "Progress Note."  Id. at 338.  Dr. Groot reported Plaintiff had found

23  housing, but had been denied SSI benefits.  Id.  Plaintiff told Dr. Groot he could never

24  work again because he "gets suicidal from work."  Id.  At the same time, Plaintiff stated

25  his medications were helpful and he had no suicidal thoughts at the time.  Id.  Dr. Groot

26  concluded Plaintiff was "mostly depression free other than stress about finances."  Id.

27  Dr. Groot recommended Plaintiff continue taking anti-depressants.  Id.

28          On April 7, 2011, Dr. Groot met with Plaintiff and recorded her observations in a

4

1   document titled "Progress Note." Id. at 337.  Dr. Groot reported Plaintiff questioned her

2   as to what she wrote on her disability notes and stated he was concerned Dr. Groot's

3   "documentation was not severe enough." Id.  Plaintiff stated he could not work because

4   he would get stressed and develop migraines.  Id.  While Plaintiff stated he was not

5   suicidal at the time, he would commit suicide if he became homeless again.  Id.

6   Nonetheless, Dr. Groot noted Plaintiff was stable and that the goal of Plaintiff's treatment

7   was to "maintain his current stability." Id.  Dr. Groot recommended Plaintiff continue

8   taking anti-depressants.  Id.

9       On May 31, 2011, Dr. Groot met with Plaintiff and recorded her observations in a

10  document titled "Progress Note." Id. at 437.  Dr. Groot reported Plaintiff aggressively

11  questioned her as to why the Social Security Administration did not take his past suicide

12  attempts seriously (presumably when assessing his application for disability benefits). Id.

13  Plaintiff also reported he was worried his SSI application would be denied and was

14  "upset he was not given a more severe prognosis." Id.  Plaintiff again stated he was not

15  suicidal at the time, but that he would commit suicide if he became homeless again.  Id.

16  Dr. Groot stated Plaintiff's statement that he would kill himself if he did not gain housing

17  was "suggestive of a personality disorder, or at minimum, being manipulative." Id.  Dr.

18  Groot also noted Plaintiff did not appear depressed and had a "smiling demeanor." Id.

19  Dr. Groot recommended Plaintiff continue taking anti-depressants.  Id.

20      On July 15, 2011, Dr. Groot met with Plaintiff and recorded her observations in a

21  document titled "Progress Note." Id. at 433.  Dr. Groot reported Plaintiff stated he had

22  been "having overall good moods" and had been bike-riding and working on his SSI

23  application.  Id.  Dr. Groot noted Plaintiff was "laughing" and joking he had post-

24  traumatic stress disorder.  Id.  Plaintiff reported he was "doing well" and was not

25  interested in medication options.  Id.  Dr. Groot recommended Plaintiff continue taking

26  anti-depressants.  Id.

27      On August 26, 2011, Dr. Groot met with Plaintiff and recorded her observations in

28  a document titled "Progress Note." Id. at 432.  Dr. Groot reported Plaintiff stated he was

"severely depressed, sleeping 16 hours a day, [had] no motivation, no energy, feeling hopeless, and intermittently suicidal without [a] plan." Id.  Plaintiff complained his appeal for SSI benefits would take one year and that realizing this "hit him like a sledgehammer." Id.  Plaintiff admitted his finances were a large part of his depression. Id.  Plaintiff also stated he used to bike and buy burgers, but he could no longer afford a burger. Id.  Plaintiff also complained of moving to housing with a smaller room and of not being able to afford cable. Id.  Dr. Groot found it "suspicious . . . that [Plaintiff's] moods are related to what he currently is struggling with for SSI," but admitted "finances are a huge stressor for most people." Id.  Dr. Groot recommended Plaintiff continue taking anti-depressants. Id.

On October 27, 2011, Dr. Groot met with Plaintiff and recorded her observations in a document titled "Progress Note." Id. at 430.  Dr. Groot reported Plaintiff stated he had been doing better and had not taken Wellburtin for two weeks because he had run out. Id.  Plaintiff stated he wished to obtain SSI benefits and asked for a letter stating he should be psychologically evaluated as soon as possible. Id.  Dr. Groot observed Plaintiff was "doing much better" and had "positive moods . . . [and] [wa]s eating healthy, and exercising." Id.  Dr. Groot recommended Plaintiff continue taking anti-depressants. Id.

On November 30, 2011, Dr. Groot met with Plaintiff and recorded her observations in a document titled "Progress Note." Id. at 429.  Dr. Groot reported Plaintiff "continues to be doing well mostly, struggles with finances, but is happy that he has a place to live and has food stamps." Id.  Plaintiff stated he felt his anti-depressant medications had been helpful and he had no suicidal thoughts. Id.  Dr. Groot recommended Plaintiff continue taking anti-depressants. Id.

On February 29, 2012, Dr. Groot met with Plaintiff and recorded her observations in a document titled "Progress Note." Id. at 426.  Dr. Groot reported Plaintiff "continues to struggle financially, has difficulties with transportation, has been sleeping 16-17 hours a day, and overall feels depressed and hopeless." Id.  Plaintiff expressed his frustration with his application for SSI benefits. Id.  Plaintiff stated he had been thinking about

suicide, but had no plan in mind.  Id.  Dr. Groot concluded Plaintiff had reported "worsening depression" and "appear[ed] to retreat[] to old habits of isolating and sleeping most of the day."  Id.  Dr. Groot recommended Plaintiff continue taking anti-depressants.  Id.

On July 3, 2012, Dr. Groot met with Plaintiff and recorded her observations in a document titled "Progress Note."  Id. at 422.  According to these notes, Plaintiff stated a hearing on his SSI benefits application had been scheduled for October 2012.  Id.  Plaintiff reported he would not even be "that happy" if he got SSI benefits because he felt "retired as it is."  Id.  Plaintiff indicated he might use the SSI benefits to buy a motorcycle because he previously enjoyed riding motorcycles.  Id.  Plaintiff also stated he felt chronically suicidal, although he did not have a plan to commit suicide.  Id.  Plaintiff described himself as "feeling flat, and having no emotion."  Id.  Dr. Groot concluded Plaintiff was "chronically suicidal and depressed with incongruent effect, unchanged from prior visits."  Id.

On August 3, 2012, Dr. Groot met with Plaintiff and recorded her observations in a document titled "Progress Note."  Id. at 418.  According to these notes, Plaintiff stated he hoped to get SSI benefits after the scheduled hearing in October 2012.  Id.  Plaintiff stated he had plans to buy an inexpensive motorcycle and a metal detector.  Id.  Plaintiff also stated he wished to walk along the beach and buy a swimsuit so he could start swimming again.  Id.  Plaintiff noted his anti-depressant medication had been working well, but that he had chronic suicidal thoughts.  Id.  Dr. Groot believed Plaintiff "appear[ed] to be improving," given his positive plans for the future.  Id.

On September 10, 2012, Dr. Groot met with Plaintiff and recorded her observations in a document titled "Progress Note."  Id. at 417.  According to these notes, Plaintiff stated he believed he would be "very suicidal" if he was denied SSI benefits.  Id.  Nonetheless, Plaintiff agreed to meet with Dr. Groot after the hearing to discuss his care.  Id.  Plaintiff also noted he wished to go to the beach and use a metal detector, but could not get motivated.  Id.  Dr. Groot concluded Plaintiff was "doing about the same or

better." Id.

On November 8, 2012, Dr. Groot signed a letter stating Plaintiff was her client and that Dr. Groot was "not against him receiving SSI/SSDI/SSA benefits for his mental health diagnosis." Id. at 480.

### 2.     Dr. Karen Parker Anderson

Dr. Anderson, PhD., a therapist at Clinicas del Camino Real, Inc., treated Plaintiff from September 10, 2010 to August 3, 2012. Id. at 448-78. At the outset of Plaintiff's treatment in September 10, 2010, Dr. Anderson reported Plaintiff had a Global Assessment of Functioning ("GAF") score of 50. Id. at 477. Dr. Anderson also noted Plaintiff had scored as high as 51 the previous year.[2] Id.

On September 24, 2010, Dr. Anderson met with Plaintiff. Id. at 475. Dr. Anderson recorded her observations in a document titled "Progress Notes." Id. In these notes, Dr. Anderson observed Plaintiff was living in a homeless shelter. Id. During his session with Dr. Anderson, Plaintiff claimed he did not feel at risk for suicide because he had "some housing and some hope." Id. However, Plaintiff described a history of migraine headaches and depression dating back to childhood and also reported suffering from fatigue. Id. Plaintiff also stated he "felt suicidal much of the time" and had previously attempted suicide once. Id. Dr. Anderson opined Plaintiff's reports were consistent with major depression or dysthymia and that Plaintiff suffered from a history of migraine headaches. Id. Dr. Anderson prescribed continuing individual psycho-therapy on a once-weekly to as-needed basis. Id.

On October 8, 2010, Dr. Anderson met with Plaintiff. Id. at 473. Dr. Anderson recorded her observations in a document titled "Progress Notes." Id. In these notes, Dr.

---

[2]     GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 2000) ("DSM IV-TR"). A 41-50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning. Id.

Anderson observed Plaintiff continued to live in a homeless shelter and had been
engaging in psychiatric consultation at VCBH.  Id.  During his session with Dr.
Anderson, Plaintiff reported he had been taking medications, including Wellburtin,
Celexa, and Trazodone, that had been helping his depression and migraines.  Id.  Dr.
Anderson opined Plaintiff was identifying and coping with depressive symptoms, but did
not display any "indication of psychotic features."  Id.  Dr. Anderson diagnosed Plaintiff
as suffering from major depressive disorder and dysthymia, migraine headaches, and
pulmonary embolism.  Id.  Dr. Anderson prescribed continuing individual psycho-therapy
on a once-weekly to as-needed basis.  Id.

On November 5, 2010, Dr. Anderson met with Plaintiff.  Id. at 470.  Dr. Anderson
recorded her observations in a document titled "Progress Notes."  Id.  According to these
notes, Plaintiff reported he was "doing really well."  Id.  Plaintiff claimed his memory
had improved and that it was as though his "'switch went on.'"  Id.  Plaintiff also claimed
he was "'more like himself.'"  Id.  Dr. Anderson noted she believed Plaintiff's change in
attitude was attributable to anti-depressant and migraine medications prescribed by Dr.
Groot at VCBH.  Id.  Dr. Anderson also noted Plaintiff was recognizing the symptoms of
his depression and examining the role chronic migraines played in his life.  Id.  At the
same time, Dr. Anderson stated Plaintiff's homelessness and financial condition "persist
as a stressor."  Id.  Lastly, Dr. Anderson prescribed continuing individual psycho-therapy
on a once-weekly to as-needed basis.  Id.

On November 19, 2010, Dr. Anderson met with Plaintiff.  Id. at 469.  Dr. Anderson
recorded her observations in a document titled "Progress Notes."  Id.  According to these
notes, Plaintiff reported he was "'doing good,'" was benefitting from "pharmacotherapy,"
and was still living in a homeless shelter.  Id.  Dr. Anderson noted Plaintiff was
displaying more "energy and [a] more positive outlook" and was "gradually trying to
rebuild his life."  Id.  Dr. Anderson also noted Plaitiff did not display any suicidal
tendencies or psychotic or dissociative features.  Id.  However, Plaintiff stated he felt
"unable to return to the workforce on a full-time basis."  Id.  Lastly, Dr. Anderson

1   prescribed continuing individual psycho-therapy on a once-weekly to as-needed basis.

2   Id.

3          On December 3, 2010, Dr. Anderson met with Plaintiff.  Id. at 468.  Dr. Anderson

4   recorded her observations in a document titled "Progress Notes."  Id.  According to these

5   notes, Plaintiff "continue[d] improvement" and was responding to his medication

6   regimen.  Id.  Dr. Anderson noted Plaintiff was still living in a homeless shelter and

7   benefitted from sessions, but reported he did "not feel prepared to return to work nor to

8   pursue academic preparation for career direction."  Id.  While Dr. Anderson noted

9   Plaintiff "indicates improvement," she stated Plaintiff "may continue with some level of

10  withdrawal and avoidance" and suffered from "situational stressors" related to his

11  homelessness.  Id.  Lastly, Dr. Anderson prescribed continuing individual psycho-therapy

12  on a once-weekly to as-needed basis.  Id.

13         On January 7, 2011, Dr. Anderson met with Plaintiff.  Id. at 467.  Dr. Anderson

14  recorded her observations in a document titled "Progress Notes."  Id.  According to these

15  notes, Plaintiff "reported some increase in anxiety" because he had completed the time

16  allotted for staying at the homeless shelter.  Id.  Nonetheless, Plaintiff reported his anti-

17  depressant medication had taken him "'out of the depths of depression.'"  Id.  Dr.

18  Anderson prescribed continuing individual psycho-therapy on a once-monthly to as-

19  needed basis.  Id.

20         On February 18, 2011, Dr. Anderson met with Plaintiff.  Id. at 465.  Dr. Anderson

21  recorded her observations in a document titled "Progress Notes."  Id.  According to these

22  notes, Plaintiff "report[ed] [an] increase in depressive symptoms" because he was denied

23  social security benefits.  Id.  Although Plaintiff appeared to have found a new residence,

24  he was receiving state disability benefits that would soon expire.  Id.  Hence, Plaintiff

25  was concerned about being without a source of income and losing his new home and his

26  car.  Id.  At the same time, Plaintiff stated he felt absolutely unable to work at any job at

27  any point and joked it was "nice 'to be retired.'"  Id.  Plaintiff also denied feeling any

28  suicidal tendencies, but reported having daily headaches and migraine headaches once a

week.  Id.  Dr. Anderson diagnosed Plaintiff as suffering from depression, migraine headaches, and "situational stressors" related to his homelessness and financial situation. Id.  Dr. Anderson prescribed continuing individual psycho-therapy on a once-weekly to as-needed basis.  Id.

On February 18, 2011, Dr. Anderson also drafted a letter summarizing Plaintiff's treatment.  Id. at 334.  In the letter, Dr. Anderson reported she had seen Plaintiff since an initial evaluation on September 20, 2010.  Id.  Dr. Anderson stated Plaintiff had a "severe" "level of depression" and a history of five suicide attempts.  Id.  Dr. Anderson also noted Plaintiff had previously been psychiatrically hospitalized for depression and suicidal tendencies.  Id.  Dr. Anderson noted symptoms of Plaintiff's depression included sleep and appetite disturbance, irritability, social withdrawal, passive-avoidant behaviors, and memory and concentration impairment.  Id.  Dr. Anderson additionally reported Plaintiff exhibited an "extreme sensitivity to stress," in particular to stress surrounding his loss of income and residence.  Dr. Anderson concluded Plaintiff's prognosis was "poor."  Id.

On April 29, 2011, Dr. Anderson met with Plaintiff.  Id. at 464.  Dr. Anderson recorded her observations in a document titled "Progress Notes."  Id.  According to these notes, Plaintiff suffered from anxiety because his state disability benefits would soon run out.  Id.  Plaintiff stated "I am slipping, slipping into depression" and that there was "absolutely no joy in my life."  Id.  Plaintiff also stated, "It looks like I am going to have to get a job.  I am very anxious about that."  Id.  At the same time, Plaintiff stated there had been a reduction in his migraine headaches.  Id.  Dr. Anderson concluded Plaintiff's depression was worsening.  Id.

On May 27, 2011, Dr. Anderson met with Plaintiff.  Id. at 462.  Dr. Anderson recorded her observations in a document titled "Progress Notes."  Id.  In these notes, Dr. Anderson observed Plaintiff continued to live in his apartment and was volunteering at a homeless shelter on a part-time basis.  Id.  Plaintiff reported feeling depressed regarding his lack of income and stated he told a disability evaluator he would rather "die than go to

work." Id.  While Dr. Anderson believed Plaintiff's mood had improved, she noted Plaintiff reported "absolute resistance to returning to work." Id.  Dr. Anderson also noted Plaintiff did not appear to have any immediate intention or plan to harm himself.  Id.  Dr. Anderson prescribed continuing individual psycho-therapy on a once-monthly to as-needed basis.  Id.

On June 17, 2011, Dr. Anderson completed a "Medical Source Statement (Mental)" evaluation form.  Id. at 363.  In the evaluation, Dr. Anderson diagnosed Plaintiff as suffering from recurrent major depressive disorder and dysthymia.  Id.  Dr. Anderson checked responses indicating Plaintiff was: (1) "Markedly Limited" in the "Ability To Withstand The Stress And Pressures Associated With An Eight-Hour Work Day and Day-To -Day Work Activity"; (2) "Moderately Limited" in the "Ability To Relate And Interact With Supervisors And Co-Workers," the "Ability To Understand, Remember And Carry Out An Extensive Variety Of Technical And/Or Complex Job Instructions," and the "Ability To Maintain Concentration And Attention For At Least Two Hour Increments"; and (3) "Mildly Limited" in the "Ability to Deal With The Public," and the "Ability to Understand, Remember and Carry Out Simple One-Or-Two Step Job Instructions."  Id.

On June 17, 2011, Dr. Anderson also completed a "Mental Impairment Questionnaire (RFC & Listings)" form.  Id. at 364-71.  Dr. Anderson reiterated Plaintiff's diagnosis as major depressive disorder and assessed his GAF as 45, noting it had been as high as 51 during the past year.  Id. at 364.  Dr. Anderson also noted Plaintiff's symptoms included poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, social withdrawal or isolation, anhedonia or pervasive loss of interests, difficulty thinking or concentrating, suicidal attempts, decreased energy, and pathological dependence or passivity.  Id. at 364-65.  Dr. Anderson described Plaintiff's prognosis as "poor," stated Plaintiff's stress and depression would amplify his physical disabilities, and opined Plaintiff would be absent more than three times per month from work on average due to his impairments or treatment thereof.  Id. at

366-67.  Dr. Anderson also identified various functional workplace limitations, in particular marking Plaintiff had a "poor" or no ability to (1) "Maintain regular attendance and be punctual within customary, usually strict tolerances," (2) "Complete a normal workday and workweek without interruptions from psychologically based symptoms," (3) "Accept instructions and respond appropriately to criticism from supervisors," (4) "Deal with normal work stress," and (5) "Deal with stress of semiskilled and skilled work."  Id. at 368-69.  Dr. Anderson stated Plaintiff was not a malingerer and his impairments were reasonably consistent with the symptoms and functional limitations identified in the evaluation.  Id. at 365.

On June 24, 2011, Dr. Anderson met with Plaintiff.  Id. at 461.  Dr. Anderson recorded her observations in a document titled "Progress Notes."  Id.  In these notes, Dr. Anderson observed Plaintiff reported "some increase in depressive symptoms" and suffered from "financial stress."  Id.  Plaintiff reported feeling concerned about the possible loss of his residence.  Id.  Plaintiff stated his migraines had decreased, but Dr. Anderson indicated Plaintiff's migraines could occur possibly in correlation with depressive episodes.  Id.  Dr. Anderson noted Plaintiff needed to be monitored for worsening of his depressive symptoms and for a potential risk of suicide.  Id.  Dr. Anderson prescribed continuing individual psycho-therapy on a once-monthly basis.  Id.

On July 22, 2011, Dr. Anderson met with Plaintiff.  Id. at 456.  Dr. Anderson recorded her observations in a document titled "Progress Notes."  Id.  In these notes, Dr. Anderson observed Plaintiff reported feeling stress because of his financial situation and stated his depression had caused a "'loss of free will.'"  Id.  At the same time, Plaintiff had less anxiety regarding housing because he was able to procure housing assistance.  Id.  Dr. Anderson concluded Plaintiff's "depression appears somewhat improved possibly related to a reduction in fear regarding possibly losing housing."  Id.  Dr. Anderson prescribed continuing individual psycho-therapy either every other week or on a once-monthly basis.  Id.

On October 28, 2011, Dr. Anderson met with Plaintiff.  Id. at 454.  Dr. Anderson

1  recorded her observations in a document titled "Progress Notes." Id.  In these notes, Dr.

2  Anderson observed Plaintiff reported continued depression, with occasional worsening of

3  depressive symptoms.  Id.  Dr. Anderson prescribed continuing individual psycho-

4  therapy on a once-monthly to as-needed basis.  Id.

5       On December 16, 2011, Dr. Anderson met with Plaintiff.  Id. at 452.  Dr. Anderson

6  recorded her observations in a document titled "Progress Notes."  Id.  In these notes, Dr.

7  Anderson observed Plaintiff reported an "increase in his depressive symptoms."  Id.

8  Plaintiff complained of still having "'no money'" and was concerned about his housing

9  situation.  Id.  Plaintiff reported making efforts to expedite his disability benefits hearing.

10 Id.  While Dr. Anderson reported Plaintiff denied suicidal ideation, he seemed "more

11 depressed" and was "near tears at times."  Id.  Dr. Anderson prescribed continuing

12 individual psycho-therapy on a once-monthly basis.  Id.

13      On July 20, 2012, Dr. Anderson met with Plaintiff.  Id. at 450.  Dr. Anderson

14 recorded her observations in a document titled "Progress Notes."  Id.  In these notes, Dr.

15 Anderson observed Plaintiff reported "continued depression and migraine headaches"

16 and "feelings of discouragement related to disability process."  Id.  Plaintiff reported a

17 hearing in his case was scheduled for October 2012 and was concerned he would not win

18 his case.  Id.  Plaintiff stated that if he lost his case at the October 2012 hearing, he

19 "might as well die."  Id.  Nonetheless, Dr. Anderson stated Plaintiff did not "indicate

20 desire to harm himself" at the time.  Id.  Plaintiff also stated, "'I just can't work

21 anymore'" and referred to "'mean people'" in the workplace.  Id.  Furthermore, Plaintiff

22 reported stress related to financial constraints, including his inability to afford

23 medications for his migraine headaches.  Id.  Dr. Anderson prescribed continuing

24 individual psycho-therapy on a once-monthly basis.  Id.

25      On August 3, 2012, Dr. Anderson met with Plaintiff.  Id. at 448.  Dr. Anderson

26 recorded her observations in a document titled "Progress Notes."  Id.  In these notes, Dr.

27 Anderson observed Plaintiff continue[d] to cope with situational stress, [including]

28 financial and other resource constraints."  Id.  Dr. Anderson prescribed continuing

14

individual psycho-therapy either every other week or on an as-needed basis. Id.

On October 9, 2012, Dr. Anderson completed a second "Medical Source Statement (Mental)" evaluation form. Id. at 439. In the evaluation, Dr. Anderson diagnosed Plaintiff as suffering from recurrent major depressive disorder. Id. Dr. Anderson checked a response indicating Plaintiff was "Markedly Limited" in the "Ability To Withstand The Stress And Pressures Associated With An Eight-Hour Work Day and Day-To-Day Work Activity." Id.

On October 9, 2012, Dr. Anderson also completed a second "Mental Impairment Questionnaire (RFC& Listings)" form. Id. at 440-47. Dr. Anderson reiterated Plaintiff's diagnosis as major depressive disorder and stated his GAF at the time was 50, having been as high as 50 during the past year. Id. at 440. Dr. Anderson noted Plaintiff's symptoms included sleep disturbance, mood disturbance, and suicidal ideation or attempts. Id. at 440-41. Dr. Anderson noted Plaintiff "may be a suicide risk in the absence of adequate interventions." Id. at 442. Dr. Anderson also again opined Plaintiff would be absent from work more than three times per month on average due to his impairments or treatment thereof. Id. at 443. With regard to Plaintiff's workplace functional limitations, Dr. Anderson marked that Plaintiff has either "poor" or no ability to: (1) "Maintain regular attendance and be punctual within customary, usually strict tolerances," (2) "Complete a normal workday and workweek without interruptions from psychologically based symptoms," and (3) "Deal with normal work stress." Id. at 444-45.

On October 10, 2012, Dr. Anderson wrote a letter to Plaintiff's attorney, Andrew Koenig. Id. at 438. In the letter, Dr. Anderson stated Plaintiff had a "remarkable . . . aversion to working at all in any capacity," citing Plaintiff's statements to her that he would rather die than return to work. Id. Dr. Anderson noted this resistance to work could render Plaintiff a suicide risk, if he felt his options were undesirable. Id. Dr. Anderson concluded that while Plaintiff's depression initially improved in response to psychiatric medication and lifestyle changes, Plaintiff's depression recurred as Plaintiff

15

anticipated his disability hearing, feared losing his case, and was faced with the possibility of either returning to work or living with limited resources.  Id.

**C.    Agency Medical Opinions**

**1.    Examining Sources**

**a.    Dr. Samantha Case**

On January 8, 2011, psychiatrist Dr. Samantha Case, Psy.D., a state agency medical consultant, completed a one-time psychiatric examination of Plaintiff.  Id. at 287-90.  Dr. Case reported Plaintiff stated "he would rather be dead than work," but stated he only had moderately severe anxieties.  Id. at 287.  While Plaintiff did not acknowledge any suicidal ideations or plans at the time of the evaluation, Dr. Case observed "some self-injurious behavior of cutting on his arm was reported."  Id.  Plaintiff reported he "has two periods of depressed mood most of the day, hypersomnia, diminished interest in activities[,] and feeling worthless."  Id. at 289.  Plaintiff also reported "having the ability to complete normal daily living activities."  Id.

Dr. Case concluded Plaintiff's "symptoms of depression are related to not wanting to work."  Id.  Dr. Case also concluded "[t]he degree of mental health functioning appears to be treatable," "[t]he likelihood for recovery is realistic," and Plaintiff's mental health condition would probably abate within 12 months.  Id.  In short, Dr. Case stated Plaintiff was "cognitively mild[ly] impaired and is expected to remain so."  Id. at 290.

Based on the evaluation, Dr. Case assessed Plaintiff's functional capacities.  Id.  Dr. Case concluded Plaintiff: (1) was capable of performing one or two simple repetitive tasks on a regular basis; (2) was not impaired in the ability to accept instructions or interact with coworkers; (3) could perform work activities on a consistent basis; and (4) was able to maintain regular attendance in the workplace.  Id.  According to Dr. Case, Plaintiff only had two functional limitations: (1) he was not capable of handling his funds in his own best interest; and (2) he would have difficulty dealing with the usual stress encountered in the workplace.  Id.

**b.    Dr. Ursula Taylor**

16

1    On December 16, 2010, Dr. Ursula Taylor, M.D., a state agency medical

2 consultant, conducted a one-time internal medicine consultative examination of Plaintiff,

3 to address Plaintiff's complaint that he suffered from deep vein thrombosis.  Id. at 282-

4 86.  Dr. Taylor concluded Plaintiff suffered from deep vein thrombosis in both legs and

5 had a history of multiple pulmonary emboli.  Id. at 285.  Dr. Taylor also observed

6 Plaintiff had a history of asthma.  Id.  Dr. Taylor noted Plaintiff was "currently on

7 warfarin, a blood thinner" and had a "high risk for bruising."  Id.  Dr. Taylor stated

8 "[o]verall [Plaintiff] ambulates well with ease" and that Plaintiff "did not have any lower

9 extremity tenderness at all at this point."  Id.

10    Based on the evaluation, Dr. Taylor concluded Plaintiff had the following

11 exertional limitations: (1) Plaintiff could lift and carry 20 pounds occasionally and 10

12 pounds frequently on a limited basis because of his deep vein thrombosis; (2) Plaintiff

13 was limited to working 6 hours out of an 8-hour day because of his deep vein thrombosis;

14 and (3) Plaintiff should avoid extremes in temperatures because of his deep vein

15 thrombosis and history of pulmonary emboli and should only occasionally be exposed to

16 fumes, dust, pollution, gases, and chemicals because of a history of asthma.  Id. at 285-

17 86.

18        **2.    Non-Examining Sources**

19            **a.    Dr. A. Garcia**

20    On July 6, 2011, Dr. A. Garcia, M.D., a non-examining state agency medical

21 consultant, reviewed Plaintiff's medical file, completed a psychiatric evaluation of

22 Plaintiff, and completed "Psychiatric Review Technique" and "Mental Residual

23 Functional Capacity Assessment" forms.  Id. at 372-85.  Dr. Garcia concluded Plaintiff

24 suffered from severe and recurrent major depression disorder.  Id. at 375.  However, Dr.

25 Garcia observed Plaintiff's impairment had only mild to moderate limitations on his daily

26 living, capacity to engage in social functioning, memory, and ability to understand

27 instructions and concentrate for extended periods.  Id. at 380, 385.  In particular, Dr.

28 Garcia concluded Plaintiff was only moderately limited in his "ability to complete a

17

1    normal workday and workweek without interruptions from psychologically based

2    symptoms and to perform at a consistent pace without an unreasonable number and

3    length of rest periods." Id. at 384.

4            **b.    Dr. W. Jackson**

5           On January 13, 2011, Dr. W. Jackson, M.D., a non-examining state agency medical

6    consultant, reviewed Plaintiff's medical file and completed a "Physical Residual

7    Functional Capacity Assessment" form. Id. at 291-95. On the form, Dr. Jackson checked

8    responses on the form indicating Plaintiff had no exertional limitations, but should: (1)

9    never climb ladders, ropes, or scaffolds; (2) avoid concentrated exposure to fumes, odors,

10   dusts, gases, and poor ventilation; and (3) avoid even moderate exposure to hazards such

11   as heights. Id.

12   **D.    Third Party Statements**

13          **1.    Kalie McCormack**

14          On May 10, 2011, Kalie McCormack, Plaintiff's Case Manager at a homeless

15   shelter Plaintiff had stayed after his discharge from the Hillmont Psychiatric Unit,

16   executed a third-party statement in support of Plaintiff's applications for DIB and SSI.

17   Id. at 215-22. In the statement, McCormack noted she had known Plaintiff since June 9,

18   2010 and spent 1 to 2 hours per day with Plaintiff engaging in case management at the

19   shelter. Id. at 215. McCormack stated Plaintiff had been fired from his last job because

20   of his depression. Id. at 221. At the time of his admission to Hillmont Psychiatric Unit,

21   McCormack described Plaintiff as "severely depressed and isolated." Id. at 222.

22   According to McCormack, after Plaintiff began taking anti-depressants, Plaintiff isolated

23   himself less, but was still depressed. Id.

24          McCormack stated Plaintiff did not handle stress well and became depressed and

25   tended to isolate himself. Id. Additionally, McCormack stated Plaintiff handled changes

26   in his routine with "difficulty." Id. McCormack also claimed Plaintiff still had suicidal

27   tendencies. Id. at 221. At the same time, McCormack reported Plaintiff engaged in

28   ordinary daily activities, including caring for himself, socializing, reading, biking, and

watching movies.  Id. at 217-19.

McCormack also noted Plaintiff's illness affected his concentration and that "at times [Plaintiff] has trouble with follow through and his illness makes it hard for him to focus and be patient working toward a goal."  Id. at 220.  McCormack estimated Plaintiff could pay attention for up to 30 minutes at a time.  Id.

### 2.   Ann M. Bernstein

On October 2, 2010, Ann M. Bernstein, Plaintiff's sister, executed a third-party statement in support of Plaintiff's applications for DIB and SSI.  Id. at 194-202. Bernstein lives in the state of Washington, but talks with Plaintiff over the phone.  Id. at 194.  Bernstein stated she did not know details regarding Plaintiff's daily affairs, such as whether he shopped, prepared his own meals, or performed household chores.  Id. at 196-98.  However, Bernstein did observe Plaintiff "hides" when "things get stressful" and changes in routine cause Plaintiff stress.  Id. at 200.  In fact, Bernstein reported once having to drive to California to find Plaintiff after he failed to return her calls.  Id. at 201. Bernstein stated she found Plaintiff "hiding away avoiding people, living in squalor."  Id. at 202.

Bernstein also claimed Plaintiff had attempted suicide as a teenager and had also attempted suicide twice in the past several years.  Id.  Bernstein noted Plaintiff had migraine headaches and could not keep a job.  Id.  While Plaintiff reported he was fine during phone calls with Bernstein, Bernstein claimed not to believe him and believed Plaintiff did not know how to deal with life.  Id.  Bernstein worried "that the next call I get will be that [Plaintiff] is dead."  Id.

### E.   ALJ Hearing

### 1.   Plaintiff's Testimony

At the October 15, 2012 hearing before the ALJ, Plaintiff testified he had not worked since March 2009 and that he had previously worked as a salesperson for 15 years.  Id. at 49.  Plaintiff stated he had stopped working in March 2009 because he was laid off.  Id.  Plaintiff claimed he would not have continued working even if he had been

19

allowed to because of his depression and migraines.  Id.  Plaintiff claimed he suffered from approximately two bad migraines every month.  Id. at 50.  To treat his migraines, Plaintiff alleged he took medication, shut off all of the lights in his home, closed his curtains, and slept at home for at least a day.  Id.  Plaintiff also claimed he suffered from light headaches every day and took painkillers every day to treat these headaches.  Id. at 51.  Plaintiff testified his headaches prevented him from working.  Id. at 52.

Plaintiff also testified he suffered from asthma.  Id. at 51.  Plaintiff claimed it was "pretty well controlled" and that he had not had to go to an emergency room for treatment in the past 20 years.  Id.

Plaintiff testified his doctor had taken him off of warfarin because his deep vein thrombosis had been resolved.  Id.  at 51-52.  Plaintiff also stated his treating physician felt "confident" Plaintiff no longer needed treatment for his deep vein thrombosis.  Id. at 52.

Plaintiff testified his depression caused him to isolate himself and stay away from other people.  Id. at 53.  Plaintiff testified he slept about 12 hours each day, sleeping 6 hours at a time.  Id.  Plaintiff claimed this reduced the number of headaches he suffered from.  Id.  Plaintiff also stated he slept up to 14 hours per day twice a month, when his depression intensified.  Id. at 61.

Plaintiff claimed that even if he did not suffer from migraines, his depression and anxieties regarding personal interaction would keep him from working.  Id. at 56. Plaintiff stated he had considered performing a job that did not require interaction with people, but felt he could not handle the "everyday stresses" of such a job.  Id. at 55, 57. Plaintiff claimed his attention span would wander after 30 minutes of focusing on a particular task and he would need to take a break for a few minutes before he could continue.  Id. at 63-64.

When asked about his statements to Dr. Anderson that he would rather die than go back to work, Plaintiff claimed the statement did not actually reflect his mental state at the time and that he made the statement because he lost his temper.  Id. at 62.

1

### 2.     Vocational Expert's Testimony

2    The ALJ presented various descriptions of hypothetical individuals to a vocational

3  expert ("VE"), and asked the expert what jobs such an individual would be able to

4  perform.  The first hypothetical individual was a person "who is closely approaching

5  advanced age, has more than a high school education, some past work experience; who

6  should avoid concentrated exposure to temperature extremes like cold and heat; should

7  avoid concentrated exposure to dust, fumes, respiratory irritants; should not climb ladders

8  or work at unprotected heights; and is limited to simple, repetitive tasks with limited

9  interaction with the general public."  Id. at 67.  The ALJ asked the VE whether there were

10 jobs that could accommodate the person's limitations.  Id.  The VE answered that such an

11 individual would be able to work as a mail clerk/sorter, a hand packer, and a sandwich

12 maker, as those positions are described in the Dictionary of Occupational Titles ("DOT").

13 Id. at 67-68

14    The second hypothetical individual was the same as the first hypothetical

15 individual, but would miss two days per month on a regular basis.  Id. at 68.  The VE

16 answered that such an individual could not find unskilled work and that employers would

17 only tolerate an individual who missed, on average, one day of work per month.  Id.

18

### III.

19

### STANDARD FOR EVALUATING DISABILITY

20    In order to qualify for DIB or SSI, a claimant must demonstrate a medically

21 determinable physical or mental impairment that (1) prevents her from engaging in

22 substantial gainful activity and (2) is expected to result in death or to last for a continuous

23 period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998).

24 The impairment must render the claimant incapable of performing the work she

25 previously performed and incapable of performing any other substantial gainful

26 employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098

27 (9th Cir. 1999).

28    To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ

conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.[3]

(4)  Is the claimant capable of performing work she has done in the past?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100;

---

[3]  "Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's [residual functional capacity]."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)).  In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  This involves, inter alia, evaluating the credibility of a claimant's testimony regarding his capabilities.  Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).

Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

## IV.

## THE ALJ'S DECISION

**A.   Step One**

At step one, the ALJ found Plaintiff "has not engaged in substantial gainful activity since March 4, 2009, the alleged onset date" of disability.  AR at 25.

**B.   Step Two**

At step two, the ALJ found Plaintiff "has the following severe impairments: major depression; asthma."  Id.

The ALJ found Plaintiff's history of pulmonary embolism due to deep vein thrombosis to be a non-severe impairment because Plaintiff had testified this issue had resolved and he no longer required medication.  Id. at 28.

The ALJ also found Plaintiff's impairment of migraine headaches to be non-severe. Id.  The ALJ found the "medical records simply do not reflect the type of frequency of complaints regarding headaches that one would expect if the headaches more than minimally affected the claimant's ability to perform work-related activities."  Id.  In support, the ALJ noted "follow-ups with the [Plaintiff's] primary careproviders from August 2010 make no mention of any uncontrolled migraines or headaches."  Id. Furthermore, the ALJ stated that on December 8, 2010, Plaintiff was reported to be stable on his migraine medication.  Id.  Lastly, Plaintiff did not mention any headaches to state agency medical consultant Dr. Ursula Taylor in December 2010.  Id.  In sum, the ALJ concluded "[t]here is essentially no recent treatment for migraine headaches suggesting that these were not as bothersome or disruptive to daily activities as now alleged."  Id. For these reasons, the ALJ found the impairment to be non-severe.  Id.

**C.   Step Three**

The ALJ found Plaintiff did not have an impairment or combination of impairments that meets or equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.

**D.   RFC Determination**

The ALJ found Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: avoid extreme heat or cold; no concentrated exposure to dust, fumes, respiratory irritants; no climbing ladders or working at unprotected heights; and only simple repetitive tasks requiring only limited interaction with the general public." Id. at 29.

When determining Plaintiff's RFC, the ALJ first noted the following testimony from Plaintiff regarding his symptoms. Id. at 30. Plaintiff testified he stopped working because he was laid off, but stated he had been leaving work early about two times a month due to his impairments. Id. Plaintiff claimed he experienced, on average, two 24-hour-long "bad" migraines a month, for which he took prescription medication and closed curtains to darken rooms he was in. Id. Plaintiff also claimed to experience daily "regular" headaches, for which he took Advil and Asprin. Id. Plaintiff also testified he suffered from depression, claustrophobia, and was afraid of being around other people. Id. As a result, Plaintiff claimed he: (1) saw a therapist once a month and a psychiatrist every other month; (2) slept 12 hours a day in shifts of six hours; (3) could only focus for 30 minutes at a time; and (4) suffered from stress every day. Id. Plaintiff claimed these impairments prevented him from working 8 hours a day. Id. Plaintiff admitted stating he would "rather die than work," when his therapist, Dr. Anderson, talked to him about returning to work. Id.

The ALJ concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms Plaintiff alleged, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC determination. Id. The ALJ concluded Plaintiff "experiences situational depression when confronted with the fact that he may not receive disability benefits and [may] have to go back to work." Id. The ALJ also concluded Plaintiff "has a strong aversion to work, and his own treatment providers have suspected malingering or at least an 'unconscious' maintenance

24

1   of a 'sick role' in order to obtain disability benefits." Id.  The ALJ cited two reasons in
2   support of these conclusions. Id. at 30-31.

3        First, the ALJ cited Plaintiff's medical records, relying chiefly on Dr. Anderson
4   and Dr. Groot's treatment notes. Id. at 30.  The ALJ noted the "generally mild symptoms
5   in [Dr. Groot's] treatment notes are consistent with the [larger] record that consistently
6   reflects the [Plaintiff's] pursuit of disability rather than pursuit of treatment. Id.
7   Furthermore, the ALJ noted both Dr. Groot and Dr. Anderson's progress notes showed
8   Plaintiff was "mostly depression free" and only suffered stress related to financial
9   circumstances. Id.  In particular, the ALJ cited a statement by Dr. Anderson in an
10  October 10, 2012 letter describing Plaintiff's remarkable aversion to work and stating
11  Plaintiff only reported recurring symptoms as he anticipated his disability hearing. Id. at
12  31.  Lastly, the ALJ credited the opinions of state agency medical consultants Dr. Garcia
13  and Dr. Jackson, who both found Plaintiff only moderately limited by his impairments.
14  Id.  The ALJ noted there were few references in the medical record to limitations greater
15  than those found by the consultants. Id.  The ALJ concluded from the medical record that
16  "Plaintiff had [a] good response to medication and was observed to be euthymic and
17  doing well." Id.

18       Second, the ALJ cited Plaintiff's behavior and conduct.  The ALJ cited a report
19  from Dr. Groot in April 2011 that Plaintiff was upset because he felt his disability
20  evaluation would not support his pursuit of disability benefits. Id. at 30.  The ALJ also
21  cited the fact that Plaintiff repeatedly referenced being "retired," and appeared to seek
22  disability benefits to support a lifestyle involving motorcycle riding, walks on the beach,
23  and swimming in the ocean. Id.  The ALJ also cited the fact that Plaintiff was worried his
24  SSI application would be rejected and experienced displeasure when his psychologist did
25  not opine that he had a more severe prognosis. Id.

26       The ALJ did not credit the exertional restrictions noted by Dr. Taylor because the
27  restrictions were specifically related to Plaintiff's deep vein thrombosis, which Plaintiff
28  claimed to no longer suffer from at the hearing. Id. at 31.

1    While the ALJ acknowledged Dr. Case's January 2011 psychiatric evaluation of
2    Plaintiff, the ALJ did not discuss or assess the credibility of Dr. Case's evaluation when
3    issuing her RFC determination.  Id. at 26.

4    The ALJ also gave "little weight" to Dr. Sta. Romana's conclusory statement that
5    Plaintiff is unable to work.  Id. at 31.

6    The ALJ similarly disregarded Dr. Anderson's description of Plaintiff's symptoms,
7    stating they were based on Plaintiff's reports and were inconsistent with treatment notes
8    showing Plaintiff's depression was in at least partial remission and his only anxiety was
9    related to being denied disability and the prospect of having to return to work.  Id.

10   The ALJ also gave "little weight" to the statements of Plaintiff's sister regarding
11   Plaintiff's suicide attempts.  Id.  The ALJ noted Plaintiff's sister lived out of state and did
12   "not have knowledge of the specifics of the [Plaintiff's] condition."  Id.  Ultimately, the
13   ALJ found Plaintiff's treatment notes to be more probative of Plaintiff's actual condition
14   than Plaintiff's sister's statements.  Id.

15   Lastly, the ALJ considered the statement of Plaintiff's Case Manager that Plaintiff
16   is able to care for himself, goes out daily, is able to shop, and participates in social
17   activities.  Id.  While the ALJ acknowledged that Plaintiff's Case Manager reported
18   Plaintiff continued to experience some depression even after seeking treatment, the ALJ
19   concluded Plaintiff's treatment notes were entitled to "greater weight."  Id.

20   **E.    Step Four**

21   At step four, the ALJ found Plaintiff is not capable of performing past relevant
22   work in sales and truck delivery.  Id.

23   **F.    Step Five**

24   At step five, the ALJ found "there are jobs that exist in significant numbers in the
25   national economy that the claimant can perform."  Id. at 32.  While the ALJ conceded
26   Plaintiff's "ability to perform work at all exertional levels has been compromised by
27   nonexertional limitations," the ALJ cited the VE's testimony that Plaintiff could perform
28   the requirements of a hand packer and sandwich maker.  Id.  Hence, the ALJ concluded

26

Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Id. at 33.  As a result, the ALJ found Plaintiff was "not disabled" at Step Five.  Id.

## V.

## PLAINTIFF'S CLAIMS

In the Joint Stipulation, Plaintiff asserts the following claims:

1.     The ALJ erroneously rejected the opinion of Plaintiff's treating and examining physicians.

2.     The ALJ's RFC assessment was unsupported by substantial evidence and, as a result, the ALJ erred in relying upon an allegedly incomplete and inaccurate hypothetical question to the vocational expert.

3.     The ALJ improperly rejected third party written statements.

4.     The ALJ's adverse credibility determination is unsupported by clear and convincing evidence.

Joint Stip. at 2.

## VI.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  This Court "may set aside a denial of benefits if it is not supported by substantial evidence or it is based on legal error." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citation and internal quotation marks omitted).

"Substantial evidence" is evidence a reasonable person might accept as adequate to support a conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance. Id.  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (stating that a reviewing

27

court "may not affirm simply by isolating a specific quantum of supporting evidence") (citations and internal quotation marks omitted).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  <u>Reddick</u>, 157 F.3d at 720-21; <u>see also</u> <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").    The Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."  <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if it is "clear from the record" that the error was "inconsequential to the ultimate nondisability determination."  <u>Robbins</u>, 466 F.3d at 885 (citation and internal quotation marks omitted).

## VII.

## DISCUSSION

**A.    The ALJ's Adverse Credibility Determination was Supported by Specific, Clear, and Convincing Reasons.[4]**

In the parties' Joint Stipulation, Plaintiff challenges the ALJ's credibility determination that the "claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible."  Joint Stip. at 60; AR at 30.

### 1.    Legal Standard

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis."  <u>Molina v. Astrue</u>,

---

[4]    Plaintiff's challenge to the ALJ's credibility determination is listed as Plaintiff's fourth claim in the parties' Joint Stipulation.  Joint Stip. at 2.  Because the Court's holding regarding this fourth claim bears on whether the ALJ properly discredited the opinion of Plaintiff's treating physicians, the Court addresses it first.  <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that a physician's opinion premised on a claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's credibility).

28

1   674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).  "First, the ALJ must determine

2   whether there is objective medical evidence of an underlying impairment which could

3   reasonably be expected to produce the pain or other symptoms alleged."  Id. (citations

4   and internal quotation marks omitted).  "If the claimant has presented such evidence, and

5   there is no evidence of malingering, then the ALJ must give specific, clear, and

6   convincing reasons in order to reject the claimant's testimony about the severity of the

7   symptoms."  Id. (citations and internal quotation marks omitted).  "At the same time, the

8   ALJ is not required to believe every allegation of disabling pain, or else disability

9   benefits would be available for the asking . . . ."  Id. (citations and internal quotation

10  marks omitted).

11       "In evaluating the claimant's testimony, the ALJ may use ordinary techniques of

12  credibility evaluation."  Id. (citations and internal quotation marks omitted).  "For

13  instance, the ALJ may consider inconsistencies either in the claimant's testimony or

14  between the testimony and the claimant's conduct; unexplained or inadequately explained

15  failure to seek treatment or to follow a prescribed course of treatment; and whether the

16  claimant engages in daily activities consistent with the alleged symptoms . . . ."  Id.

17  (citations and internal quotation marks omitted).

18       "When evidence reasonably supports either confirming or reversing the ALJ's

19  decision, we may not substitute our judgment for that of the ALJ."  Ghanim v. Colvin,

20  763 F.3d 1154, 1164 (9th Cir. 2014) (citation and internal quotation marks omitted).

21  Even if "the ALJ erred in relying on one of several reasons in support of an adverse

22  credibility determination," the error is considered harmless if "the ALJ's remaining

23  reasoning and ultimate credibility determination were adequately supported by

24  substantial evidence in the record."  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d

25  1155, 1162 (9th Cir. 2008) (citation and emphasis omitted).  "So long as there remains

26  substantial evidence supporting the ALJ's conclusions on credibility and the error does

27  not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed

28  harmless and does not warrant reversal."  Id. (citations, internal quotation marks, and

alterations omitted); <u>see also</u> <u>id.</u> at 1163 ("Here, the ALJ's decision finding [the claimant] less than fully credible is valid, despite the [ALJ's] errors . . . .").

### 2. Application

#### a. The ALJ's Adverse Credibility Determination

Here, the ALJ conceded Plaintiff's "medically determinable impairments could reasonably be expected to cause" Plaintiff's alleged symptoms.  AR at 30.  Nonetheless, the ALJ rejected Plaintiff's claims that he could not work for two reasons.  <u>Id.</u>  First, the ALJ cited Plaintiff's medical records, relying chiefly on Dr. Anderson and Dr. Groot's treatment notes.  <u>Id.</u>  The ALJ noted the "generally mild symptoms in [Dr. Groot's] treatment notes are consistent with the [larger] record that consistently reflects the [Plaintiff's] pursuit of disability rather than pursuit of treatment.  <u>Id.</u>  Furthermore, the ALJ noted both Dr. Groot and Dr. Anderson's progress notes showed Plaintiff was "mostly depression free" and only suffered stress related to financial circumstances.  <u>Id.</u> In particular, the ALJ cited a statement by Dr. Anderson in an October 10, 2012 letter describing Plaintiff's remarkable aversion to work and stating Plaintiff only reported recurring symptoms as he anticipated his disability hearing.  <u>Id.</u> at 31.  Lastly, the ALJ cited the opinions of the state agency medical consultants and noted there were few references in the medical record to limitations greater than those found by the consultants.  <u>Id.</u>  The ALJ concluded from the medical record that "Plaintiff had [a] good response to medication and was observed to be euthymic and doing well."  <u>Id.</u>

Second, the ALJ cited Plaintiff's repeated statements regarding his aversion to work, constant anxieties about whether he would gain disability benefits, and his desire to gain disability benefits to support a lifestyle involving motorcycle riding, walks on the beach, and swimming in the ocean.  <u>Id.</u>  The ALJ also cited Plaintiff's statement to Dr. Groot on April 7, 2011, complaining Dr. Groot's "documentation [of his disabilities] was not severe enough."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 337.  From these statements and Plaintiff's medical records, the ALJ concluded Plaintiff "has a strong aversion to work," "experiences situational depression when confronted with the fact that he may not receive

1  disability benefits and [may] have to go back to work," and was seeing medical providers

2  with the goal of procuring disability benefits as opposed to meaningful treatment.  Id.

3  Hence, the ALJ rejected Plaintiff's subjective complaints of disability.  Id.

4            **b.    Plaintiff's Arguments**

5            Plaintiff challenges the ALJ's credibility determination on two primary grounds.

6  First, Plaintiff challenges the ALJ's reliance on Plaintiff's statements showing his anxiety

7  about gaining disability benefits, claiming Plaintiff's anxiety about his disability benefits

8  application was actually motivated by the fact that he was "homeless, had severe financial

9  stress that exacerbated his depression, and in his mind the stakes were so high that he

10 expressed he may commit suicide if he lost his disability case."  Joint Stip. at 60.[5]

11           Second, Plaintiff criticizes the ALJ's reliance on his statements that he wished to

12 use disability benefits proceeds to buy a motorcycle, visit the beach, and swim.  Id.

13 Plaintiff claims these plans were "therapeutic goals encouraged by Dr. Groot as part of a

14 positive life plan and [P]laintff only ruminated about his desire to do such things if he

15 won his case because he would the[n] have the financial ability to pursue these goals."

16 Id.

17 ///

18           **c.    The ALJ's Credibility Determination Was Not Erroneous.**

19           The Court holds Plaintiff's statements to his treating physicians supported the

20 ALJ's adverse credibility determination.  As the ALJ recognized, Plaintiff's statements to

21 his treating physicians showed Plaintiff exaggerated his symptoms because of ulterior

22

23       [5]  Plaintiff also cites a statement he made to Dr. Groot on July 3, 2012 that he would

24 not even be "that happy" if he was awarded disability benefits.  Joint Stip. at 61; see also

25 AR at 422.  Plaintiff appears to argue his statement shows he was not merely seeing

   treating sources to procure disability benefits.  Id. at 61.  However, Plaintiff's statement

26 on July 3, 2012 appears to have been an isolated incident.  The following month, on

27 August 3, 2012, Plaintiff again expressed to Dr. Groot that he hoped to gain disability

   benefits.  AR at 418.  Two months later, on September 10, 2012, Plaintiff stated to Dr.

28 Groot that he would be "very suicidal" if did not gain disability benefits.  Id. at 417.

motives: namely, in order to gain disability benefits and avoid work.  In numerous sessions with Dr. Groot and Dr. Anderson, Plaintiff repeatedly told both doctors about his desire to avoid work.  See AR at 258, 338, 337 (Dr. Groot's treatment notes); id. at 469, 468, 465, 464, 462, 450 (Dr. Anderson's notes).  Plaintiff even mentioned to Dr. Anderson how he liked being unemployed, joking he enjoyed being "retired."  Id. at 465. Furthermore, Plaintiff also repeatedly mentioned to both doctors how anxious he was to gain disability benefits.  See id. at 337, 437, 432, 430, 426, 418, 417 (Dr. Groot's treatment notes); id. at 465, 464, 450 (Dr. Anderson's notes).  In fact, on two separate occasions in April and May 2011, Plaintiff told Dr. Groot he was concerned her documentation of his symptoms was not severe enough to allow him to claim disability benefits.  Id. at 337, 437.  Although Plaintiff appears to contend his anxieties about his disability application arose from his unstable financial situation, Plaintiff told Dr. Groot that if he was granted disability benefits, he wished to use them to buy a motorcycle.  Id. at 422.  Plaintiff's statements to his treatment providers thus undermine the credibility of his reports of his symptoms.

The ALJ inferred from Plaintiff's statements that Plaintiff was exaggerating his symptoms so he could gain disability benefits, avoid working, and buy a motorcycle and go to the beach.  Id. at 31.  The ALJ's inference was proper because Plaintiff's statements strongly indicated Plaintiff had ulterior motives for exaggerating his symptoms.[6]  The ALJ's adverse credibility determination based on Plaintiff's statements was therefore

---

[6]    In addition, the ALJ's inference was supported by Dr. Groot and Dr. Anderson's documentation of Plaintiff's symptoms, which showed Plaintiff's depression improved with treatment and only appeared to worsen when he feared his disability benefits application would be denied.  See Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (rejecting claimant's testimony as not credible where "contrary to [the claimant's] claims of lack of improvement, [his doctor] reported that [his] mental symptoms improved with the use of medication.").

proper.[7]  See Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1999) (an ALJ "is entitled to draw inferences logically flowing from the evidence").

Plaintiff appears to contend his statements to his treatment providers are susceptible of the interpretation that: (1) he sought to procure disability benefits because of his unstable financial situation, rather than to avoid work; and (2) his desires to use disability benefits to buy a motorcycle and go to the beach were part of a "therapeutic" and "positive" life plan.  Joint Stip. at 60-61.  However, even assuming these are valid interpretations of Plaintiff's statements, where "evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  Here, the ALJ rationally interpreted Plaintiff's repeated references to his aversion to work, his anxiety about his disability benefits application, and his desire to use his disability benefits to ride a motorcycle and go to the beach, to mean Plaintiff's claims of disability were not credible.  The Court must, therefore, uphold the ALJ's interpretation of Plaintiff's statements.  Burch, 400 F.3d at 679.

Hence, the Court concludes the ALJ's credibility determination was not erroneous.

---

[7]  Plaintiff claims the ALJ's reliance on "cavalier or morbidly humorous statements that derive from aspects of [P]laintiff's own mental illness" was erroneous.  Joint Stip. at 61.  Citing Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996), Plaintiff claims Ninth Circuit precedent prohibits an ALJ from "us[ing] the impacts of [P]laintiff's own impairments against [him] in assessing credibility."  Id.  For these reasons, Plaintiff claims the ALJ's credibility determination was erroneous.  Id.  Plaintiff's citation to Nguyen is inapposite.  In Nguyen, the Ninth Circuit held an ALJ erred when relying on a claimant's failure to initially procure treatment from a health care provider regarding his depression.  100 F.3d at 1465.  The Ninth Circuit reasoned "those afflicted [with depression] often do not recognize that their condition reflects a potentially serious mental illness" and that it was unfair "to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."  Id.  Here, the ALJ's adverse credibility determination did not rely on Plaintiff's failure to initially procure treatment for his depression.  Rather, the ALJ merely sought to assess the credibility of Plaintiff's allegations of disability by looking to Plaintiff's description of his mental state to his health care providers.

1   Even assuming certain findings or certain evidence the ALJ cited are invalid, her
2   credibility determination was supported by substantial evidence.  See Carmickle, 533
3   F.3d at 1162-63.  At most, Plaintiff has shown that the evidence "reasonably supports
4   either confirming or reversing the ALJ's decision," in which case the decision must be
5   affirmed.  Ghanim, 763 F.3d at 1164.

6   **B.     The ALJ Properly Rejected the Opinions of Plaintiff's Treating and**
7   **         Examining Physicians.**

8        Plaintiff argues the ALJ improperly rejected the opinions of the following treating
9   and examining physicians regarding Plaintiff's ability to work: (1) Dr. Karen Parker
10  Anderson, PhD.; (2) Dr. Josefina M. Sta. Romana, M.D.; (3) Dr. Jantje Groot, M.D.; (4)
11  Dr. Samantha Case, Psy.D.; and (5) Dr. Ursula Taylor, M.D.  Joint Stip. at 3-15.

12       **1.     Legal Standard**

13       The Court "distinguish[es] among the opinions of three types of physicians: (1)
14  those who treat the claimant (treating physicians); (2) those who examine but do not treat
15  the claimant (examining physicians); and (3) those who neither examine nor treat the
16  claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995),
17  as amended (Apr. 9, 1996).  "As a general rule, more weight should be given to the
18  opinion of a treating source than to the opinion of doctors who do not treat the claimant."
19  Id. (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).  A treating physician's
20  opinions are entitled to special weight because a treating physician is employed to cure
21  and has a greater opportunity to know and observe the patient as an individual.  See
22  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).  While the opinion of a
23  treating physician is thus entitled to greater weight than that of an examining physician,
24  the opinion of an examining physician is entitled to greater weight than that of a
25  non-examining physician."  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir.
26  2008).  The weight afforded a non-examining physician's testimony depends 'on the
27  degree to which [he] provide[s] supporting explanations for [his] opinions.'"  Id. (quoting
28  § 404.1527(d)(3)).

34

1    The ALJ may only reject a treating or examining physician's uncontradicted

2    medical opinion based on "clear and convincing reasons." Carmickle v. Comm'r, Soc.

3    Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  When it is contradicted by another

4    doctor's opinion, a treating or examining physician's opinion may only be rejected if,

5    after considering the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6) for evaluating

6    medical opinions, the ALJ articulates "specific and legitimate" reasons supported by

7    substantial evidence in the record.  Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir.

8    2014); Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007); Reddick v. Chater, 157 F.3d

9    715, 725 (9th Cir. 1998).  Accordingly, an ALJ confronted with conflicting medical

10   opinions must consider, *inter alia*, the length of the treatment relationship and the

11   frequency of examination; the medical specialties of the various medical sources; the

12   extent to which the medical opinions are supported by explanations; and the consistency

13   of each medical opinion with the record as a whole.  20 C.F.R. § 404.1527(c)(2)-(6); see

14   also Orn, 495 F.3d at 631.

15       An ALJ is not obliged to accept a treating source opinion that is "brief, conclusory

16   and inadequately supported by clinical findings."  Lingenfelter v. Astrue, 504 F.3d 1028,

17   1044-45 (9th Cir. 2007) (citing Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002)).

18   Furthermore, where an ALJ properly discounts a claimant's credibility, he is "free to

19   disregard" a treating physician's opinion when it is based on a claimant's subjective

20   accounts.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

21       **2.    Discussion**

22       The Court below addresses the ALJ's consideration of each of the five physicians

23   noted by Plaintiff in the Joint Stipulation, in turn.

24       **a.    Dr. Anderson**

25       Plaintiff argues the ALJ improperly rejected Dr. Anderson's assessment of

26   Plaintiff's functional capacities in five documents: (1) a June 27, 2011 "Medical Source

27   Statement (Mental)" evaluation form; (2) a June 27, 2011 "Mental Impairment

28   Questionnaire (RFC & Listings)" form; (3) an October 9, 2012 "Medical Source

35

Statement (Mental)" evaluation form; (4) an October 9, 2012 "Mental Impairment Questionnaire (RFC & Listings)" form; and (5) an October 10, 2012 letter to Plaintiff's counsel Andrew Koenig.  Joint Stip. at 5-10.  The two "Medical Source Statement (Mental)" forms and the two "Mental Impairment Questionnaire (RFC & Listings)" forms stated Plaintiff suffered from various workplace limitations as a result of major depressive disorder, including poor to no ability to deal with workplace stress and complete a normal workday.[8]  AR at 363-371, 439-447.  The 2011 "Mental Impairment Questionnaire (RFC & Listings)" assessed Plaintiff's GAF score as 45 and the 2012 "Mental Impairment Questionnaire (RFC & Listings)" assessed Plaintiff's GAF score as 50.  Id. at 364, 440.  In her October 10, 2012 letter, Dr. Anderson concluded Plaintiff had a "remarkable . . . aversion to working" that could render him a suicide risk if he felt his options were undesirable.  Id. at 438.  Dr. Anderson also commented that while Plaintiff's depression had initially improved in response to treatment, it had recurred as Plaintiff anticipated his disability hearing, feared losing his case, and was faced with the possibility of either returning to work or living with limited resources.  Id.

### (i)    The ALJ's Decision

In her decision, the ALJ rejected Dr. Anderson's opinions on Plaintiff's functional limitations set forth in all five of these documents, reasoning the documents "generally state[] the [Plaintiff's] reports of symptoms and are inconsistent with the treatment notes showing that the [Plaintiff's] depression was in at least partial remission and his only anxiety and depression was related to being denied disability and the prospect of having to return to work."  Id. at 31.  In support, the ALJ cited Dr. Anderson's notes that Plaintiff had an aversion to work and that Plaintiff's depression had only recurred when he anticipated his disability hearing.  Id.

The ALJ also later noted there was no indication in the record that Plaintiff

---

[8]    The specific functional limitations detailed by the forms are described in Section II.B.2.

1  suffered functional limitations greater than the mild restrictions described by the state

2  agency medical consultants, presumably referring to the opinions of examining

3  consultant Dr. Case and non-examining consultants Dr. Garcia and Dr. Jackson.  Id.

4             **(ii)    Plaintiff's Arguments**

5         Plaintiff argues the ALJ's decision was erroneous.  Plaintiff claims that, while his

6  depression had improved since he first began seeing Dr. Anderson, Dr. Anderson's

7  conclusion that Plaintiff could not sustain full-time work was nonetheless supported by

8  her treatment notes.  Joint Stip. at 7-8.  In support, Plaintiff cites Dr. Anderson's

9  treatment notes in April 2011, June 2011, July 2011, October 2011, December 2011, and

10 July 2012, and argues these notes indicated Plaintiff was suffering from depression.  Id.

11 Plaintiff also argues Dr. Groot's treatment notes in March 2012, July 2012, August 2012,

12 and September 2012 also show Plaintiff was suffering from depression at this time.  Id. at

13 9.  Plaintiff argues the ALJ impermissibly used "a few isolated instances of improvement

14 over a period or months or years" to conclude Plaintiff was "capable of working," in

15 violation of the Ninth Circuit's holding in Garrison v. Colvin, 759 F.3d 995 (9th Cir.

16 2014).  Id. at 10 (citing Garrison, 759 F.3d at 1017).

17             **(iii)   The ALJ Did Not Erroneously Reject Dr. Anderson's**

18                              **Opinion.**

19        The Court finds the ALJ's rejection of Dr. Anderson's opinions was not erroneous.

20 As an initial matter, the Court notes Dr. Anderson's opinions regarding Plaintiff's

21 inability to work were controverted: examining state agency medical consultant Dr. Case

22 and non-examining consultant Dr. Garcia concluded Plaintiff had only mild mental

23 limitations that did not prevent him from working.  AR at 287-90, 372-85.  Accordingly,

24 the Court reviews whether the ALJ's rejection of Dr. Anderson's controverted opinions

25 was based on "specific and legitimate" reasons supported by substantial evidence in the

26 record.  See Garrison, 759 F.3d at 1012 (holding that where a treating or examining

27 doctor's opinion is "contradicted by another doctor's opinion, an ALJ may only reject it

28 by providing specific and legitimate reasons that are supported by substantial evidence")

37

1   (internal quotation marks omitted).

2        The Court concludes the ALJ's rejection of Dr. Anderson's opinions was proper.

3   As the ALJ noted, Dr. Anderson's treatment notes did not provide credible grounds for

4   Dr. Anderson's opinion regarding Plaintiff's workplace limitations.  Dr. Anderson's

5   initial treatment notes in November 2010, December 2010, and January 2011 indicated

6   Plaintiff's mental condition had been improving as a result of taking anti-depressant

7   medication.  See AR at 468-70.  Although Plaintiff subsequently began reporting an

8   increase in symptoms of depression in February 2011, April 2011, May 2011, June 2011,

9   December 2011, July 2012, and August 2012, Dr. Anderson herself stated in treatment

10  notes during these periods that these symptoms were connected with financial stress and

11  developments in Plaintiff's disability benefits application.  See id. at 462, 464, 461, 465,

12  456, 452, 450, 448.  In fact, in her letter dated October 10, 2012, Dr. Anderson stated

13  directly that Plaintiff's depression recurred as he anticipated his disability hearing and

14  feared losing his disability application case and returning to work.[9]  Id. at 438.

15       In short, Dr. Anderson had no grounds for concluding Plaintiff's mental condition

16  had worsened after initially improving, other than Plaintiff's subjective accounts that his

17  depression was worsening—accounts that coincided with developments with his

18  disability benefits application.  Because the Court held in Section VII.A. that the ALJ

19  correctly found Plaintiff's subjective accounts to not be credible, Dr. Anderson's

20  conclusions were thus also unreliable.  As a result, the ALJ properly rejected Dr.

21

22  _____

23  [9]   Despite Plaintiff's arguments to the contrary, Dr. Groot's treatment notes
    corroborate this conclusion.  In psychiatric reports in December 2010, February 2011,

24  April 2011, May 2011, July 2011, October 2011, and November 2011, Dr. Groot
    repeatedly reported Plaintiff's mental state had either improved or was stable.  See AR at

25  337-39, 429-30, 433, 437.  Although Dr. Groot reported in August 2011, February 2012,

26  July 2012, and September 2012 that Plaintiff felt severely depressed, Dr. Groot, like Dr.
    Anderson, noted Plaintiff's mental state was connected to stress regarding his application

27  for disability benefits and his unstable housing and financial situation.  Id. at 417, 422,

28  426, 432.

1  Anderson's conclusions.[10]  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.
2  2001) (holding an ALJ is "free to disregard" a physician's opinion premised on a
3  claimant's subjective complaints where the record supports the ALJ in discounting the
4  claimant's credibility); see also Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th
5  Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief,
6  and unsupported by the record as a whole, or by objective medical findings).  Hence, the
7  ALJ's rejection of Dr. Anderson's controverted opinions was based on "specific and
8  legitimate reasons supported by substantial evidence in the record."  See Reddick, 157
9  F.3d at 725.

10              **b.    Dr. Sta. Romana**

11       Plaintiff argues the ALJ improperly disregarded Dr. Sta. Romana's assessment of
12  Plaintiff's functional capacities.  Joint Stip. at 10-12.  Specifically, Plaintiff claims the
13  ALJ improperly disregarded: (1) a signed note by Dr. Sta. Romana on July 29, 2010
14  stating that "[d]ue to [Plaintiff's] mental illness, he is unable to work at this time"; and
15  (2) a signed statement by Dr. Sta. Romana on June 16, 2010 supporting Plaintiff's
16  application for a "Disability Identification Card Application" for a public transit agency.
17  AR at 184, 248.  In her decision, the ALJ rejected Dr. Sta. Romana's opinion as
18  "conclusory."  Id. at 31.

19       The Court finds the ALJ's rejection of Dr. Sta. Romana's opinion was not
20  erroneous.  As the ALJ recognized, Dr. Sta. Romana's statements were conclusory and
21  unsupported by any medical findings or notes by Dr. Sta. Romana as to Plaintiff's
22  functional limitations.[11]  Hence, although Dr. Sta. Romana was one of Plaintiff's treating

24   [10]  Contrary to Plaintiff's claims, the ALJ's rejection of Dr. Anderson's conclusions
25  was not based on "isolated instances of improvement."  Garrison, 759 F.3d at 1017.
26  Rather, the ALJ simply found Plaintiff's reports that his symptoms worsened *after* these
     periods of improvement to be suspiciously timed and lacking in credibility.

27   [11]  In his Objections, Plaintiff cites a sentence on a single page of Dr. Sta. Romana's
28  treatment notes dated July 29, 2010, which reads as follows: "I also gave him a note to

                                        39

sources, the ALJ was not obliged to accept Dr. Sta. Romana's statements because they were "brief, conclusory and inadequately supported by clinical findings." <u>Lingenfelter</u>, 504 F.3d at 1044-45 (internal citation omitted); <u>see also</u> <u>Batson v. Comm'r of Soc. Sec.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings). Furthermore, the Court notes the ALJ's decision relied on other medical assessments that contradicted Dr. Sta. Romana's conclusory statements and contained more explanatory support, including the residual functional capacity assessments performed by the state agency medical consultants. <u>See</u> AR at 31; <u>see also</u> 20 C.F.R. § 404.1527(c)(2)(ii) ("The better an explanation a [medical] source provides for an opinion, the more weight we will give that opinion.").

In his Objections, Plaintiff claims Dr. Sta. Romana's treatment notes supported his opinions as to Plaintiff's ability to work because the treatment notes showed Plaintiff suffered from depression and had a history of suicide attempts. <u>See</u> Objections at 11 (citing AR at 259-69). However, the ALJ did not dispute Dr. Sta. Romana's findings regarding Plaintiff's mental health. Rather, the ALJ simply declined to give weight to Dr. Sta. Romana's conclusory opinion that Plaintiff could not work. <u>See</u> AR at 31. The ALJ's rejection of Dr. Sta. Romana's opinion was proper. Although Dr. Sta. Romana's treatment notes reflect Plaintiff suffered from depression, the notes do not indicate his

---

verify that he is our client and due to his illness is not able to work at this time." <u>See</u> Objections at 11 (citing AR at 259). The "note" mentioned in the quoted sentence appears to refer to the note Dr. Sta. Romana signed on July 29, 2010. <u>See</u> AR at 248. Plaintiff appears to claim this notation constituted a medical finding supporting Dr. Sta. Romana's opinions in his July 29, 2010 note and June 16, 2010 statement that Plaintiff was unable to work. Objections at 11. However, the quoted sentence merely states the fact that Dr. Sta. Romana signed the July 29, 2010 note and does not constitute an independent medical finding as to Plaintiff's ability to work.

1   depression caused any functional limitations rendering Plaintiff unable to work.[12]  See

2   Bickell v. Astrue, 343 F. App'x 275, 278 (9th Cir. 2009) (holding ALJ properly rejected

3   physician's diagnosis of depression because the physician did not "identif[y] any

4   functional limitations related to [plaintiff's] depression"); see also Lusardi v. Astrue, 350

5   F. App'x 169, 172 (9th Cir. 2009) (holding ALJ had no duty to develop record where

6   "psychodiagnostic evaluation included major depression but noted no functional

7   limitations").  Accordingly, the Court concludes the ALJ's rejection of Dr. Sta. Romana's

8   controverted and conclusory opinion was based on "specific and legitimate" reasons

9   supported by substantial evidence in the record.  Garrison, 759 F.3d at 1012.

10                  **c.    Dr. Groot**

11          Plaintiff argues the ALJ improperly disregarded Dr. Groot's opinion regarding

12   Plaintiff's entitlement to disability benefits.  Joint Stip. at 12.  In a letter dated November

13   8, 2012, Dr. Groot stated "I am not against [Plaintiff] recieving SSI/SSDI/SSA benefits

14   for his mental health diagnosis."  AR at 480.  While Plaintiff acknowledges that Dr.

15   Groot's statement was "rather tepid," Plaintiff nonetheless contends it constitutes a

16   medical opinion that Plaintiff was entitled to disability benefits.  Joint Stip. at 12.  Hence,

17   Plaintiff argues the ALJ erred in not explicitly considering the statement in her decision.

18   Id.

19

20   _____

21   [12]   Moreover, the Court notes Dr. Sta. Romana does not appear to have expressed any
     opinion on Plaintiff's ability to work in the long-term.  In his July 29, 2010 note, Dr. Sta.

22   Romana only stated Plaintiff was "unable to work *at this time*."  AR at 248 (emphasis
     added).  This is consistent with the medical record, which indicates Dr. Sta. Romana only

23   treated Plaintiff for a short period of time in June and July 2010, after Plaintiff's
     psychiatric admission to the Hillmont Psychiatric Unit in May and June 2010.  Hence,

24   even assuming Dr. Sta. Romana's opinion was correct, it only seems to have pertained to

25   Plaintiff's short-term ability to work.  See Garza v. Astrue, No. CV 07-1948-PHX-JAT,
     2009 WL 775422, at *7 (D. Ariz. Mar. 23, 2009) ("In order for Plaintiff to be under a

26   disability, she must be unable to work for at least twelve months.  Nothing about the
     phrase 'at this time' suggests a duration of a year, as required for a disability finding."),

27   aff'd, 380 F. App'x 672 (9th Cir. 2010).

28

1       Plaintiff's argument is meritless.  As an initial matter, the Court notes Dr. Groot's

2  November 2012 statement did not constitute *affirmative* support for Plaintiff's disability

3  benefits application.  As Plaintiff himself appears to recognize, Dr. Groot's statement was

4  "tepid" in nature and did not express any substantive opinion on whether Plaintiff was

5  actually entitled to disability benefits.  See Joint Stip. at 12.

6       Moreover, even assuming the ALJ erred in failing to specifically address the letter

7  in her decision, it is "clear from the record" that the error was "inconsequential to the

8  ultimate nondisability determination."  Robbins, 466 F.3d at 885 (citation and internal

9  quotation marks omitted).  While the ALJ's decision did not address the letter, it did take

10  note of Dr. Groot's many psychiatric reports on Plaintiff's mental state from September

11  2010 to August 2012.  AR at 27-28.  As the ALJ's decision explicitly noted, these reports

12  did not provide any support for the notion that Plaintiff is entitled to disability benefits.

13  Id. at 30.  While Dr. Groot consistently maintained Plaintiff suffered from depression, Dr.

14  Groot did not indicate Plaintiff's functional capacities were limited in any way.  See id. at

15  258, 337-39, 417-18, 422, 426, 429-30, 432-33, 437.  Rather, in psychiatric reports in

16  December 2010, February 2011, April 2011, May 2011, July 2011, October 2011, and

17  November 2011, Dr. Groot repeatedly reported Plaintiff's mental state had either

18  improved or was stable.  See id. at 337-39, 429-30, 433, 437.  Furthermore, Dr. Groot's

19  reports indicate Plaintiff's mental outlook in August 2012 was positive, such that Plaintiff

20  stated he wished to go to the beach, swim, and ride a motorcycle.  Id. at 418.  While Dr.

21  Groot reported in August 2011, February 2012, July 2012, and September 2012 that

22  Plaintiff felt severely depressed, Dr. Groot herself noted Plaintiff's mental state was

23  connected to stress regarding his application for disability benefits and his unstable

24  housing and financial situation.  Id. at 417, 422, 426, 432.  In fact, Dr. Groot herself

25  found it "suspicious . . . that [Plaintiff's] moods are related to what he currently is

26  struggling with for SSI."  Id. at 432.

27       In short, even assuming Dr. Groot's November 2012 letter constituted an

28  affirmative conclusion that Plaintiff was disabled, this conclusion was not corroborated

by Dr. Groot's own psychiatric reports.  Given the absence of evidence in Dr. Groot's records showing Plaintiff's functioning was limited, the ALJ's failure to address Dr. Groot's brief November 2012 letter was ultimately inconsequential to the ALJ's nondisability determination.  Robbins, 466 F.3d at 885; see also Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings).  The ALJ's failure to address Dr. Groot's letter is, thus, not grounds for reversal.

### d.    Dr. Case

Plaintiff argues the ALJ improperly disregarded Dr. Case's January 8, 2011 evaluation of Plaintiff's functional capacities, when evaluating Plaintiff's RFC.  Joint Stip. at 13.  Because Plaintiff's argument concerns the ALJ's RFC determination, the Court addresses it when assessing the ALJ's RFC findings in Section VII.C.

### e.    Dr. Taylor

Plaintiff argues the ALJ improperly disregarded state agency medical consultant Dr. Taylor's December 16, 2010 diagnosis that Plaintiff suffered from deep vein thrombosis in both legs.  Joint Stip. at 13-14; see also AR at 282-86.  In her diagnosis, Dr. Taylor had noted Plaintiff was taking warfarin, a blood thinner to treat this impairment.  AR at 285.  Dr. Taylor also noted Plaintiff was subject to a number of exertional limitations as a result of his deep vein thrombosis.  Id. at 285-86.  The ALJ disregarded Dr. Taylor's diagnosis when assessing Plaintiff's RFC because Plaintiff had testified at the hearing before the ALJ that Plaintiff's deep vein thrombosis had been resolved and Plaintiff was no longer on warfarin.  Id. at 31; see also id. at 52.

The Court finds the ALJ's rejection of Dr. Taylor's diagnosis was proper.  While Dr. Taylor's diagnosis does not appear to have been controverted by any other medical source, as the ALJ correctly recognized, the diagnosis was no longer relevant to the question of whether Plaintiff was disabled because Plaintiff himself had testified that his deep vein thrombosis had been resolved.  See Reddick, 157 F.3d at 721.  Hence, the

ALJ's rejection of Dr. Taylor's uncontroverted diagnosis was based on "clear and convincing reasons."[13]  Carmickle, 533 F.3d at 1164.

**C.      The ALJ's RFC Determination was Supported by Substantial Evidence.**

Plaintiff challenges the ALJ's RFC determination regarding Plaintiff's mental and physical limitations.  Plaintiff challenges the ALJ's RFC determination in regard to Plaintiff's mental limitations, on four grounds.[14]  First, Plaintiff argues the RFC determination did not contain all of the mental limitations found by Dr. Garcia.  Joint Stip. at 33-34.  Second, Plaintiff argues the RFC determination did not incorporate the

---

[13]   Plaintiff appears to claim the ALJ erred in disregarding Dr. Taylor's opinion because, even if Plaintiff's deep vein thrombosis had been resolved, the limitations described by Dr. Taylor were "prophylactic."  Joint Stip. at 53.  That is, Plaintiff suggests that if he were to perform work in excess of the limitations noted by Dr. Taylor, his deep vein thrombosis would recur.  Id.  However, Plaintiff's medical records provide no support for this proposition.

[14]   Plaintiff also argues the ALJ's RFC determination regarding Plaintiff's mental limitations was improper because the ALJ only credited the opinion of Dr. Garcia—a non-examining physician—when formulating this determination and rejected the opinions of examining physicians Dr. Anderson, Dr. Sta. Romana, and Dr. Groot.  Joint Stip. at 32-33.  Citing Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995), as amended (Apr. 9, 1996), Plaintiff argues "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  Id.  Consequently, Plaintiff concludes Dr. Garcia's opinion cannot support either the rejection of the opinions of the examining physicians or the RFC determination.  Id.

However, as the Court found in Section VII.B.2., the ALJ's rejection of Dr. Anderson, Sta. Romana, and Groot's opinions was either proper or harmless.  Carmickle, 533 F.3d at 1164.  Moreover, although Dr. Garcia was a non-examining physician, Plaintiff does not identify how Dr. Garcia's opinion was inconsistent with the medical record.  Hence, the Court rejects Plaintiff's argument.  See Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

ALJ's finding that Plaintiff had moderate difficulties in his concentration, persistence, or pace.  Id. at 34-38.  Third, Plaintiff argues the RFC determination improperly did not include a finding that Plaintiff would suffer possible decompensation in the workplace.  Id. at 38-39.  Fourth, Plaintiff argues the ALJ's determination did not include mental limitations found by Dr. Case.  Id. at 13.

Plaintiff also argues the ALJ's RFC determination in regard to Plaintiff's *physical* limitations was improper, on two grounds.[15]  First, Plaintiff contends the RFC determination did not encompass physical limitations caused by Plaintiff's obesity.  Id. at 41-42.  Second, Plaintiff appears to argue the RFC determination did not encompass physical limitations caused by Plaintiff's migraine headaches.  Id. at 40-41.

### 1.    Legal Standard

In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including medical records, lay evidence, and the effects of symptoms (including pain) that are reasonably attributed to a medically determinable impairment.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006); see also 20 C.F.R. § 404.1545(a)(3)

---

[15]   Plaintiff also argues the ALJ's RFC determination regarding Plaintiff's physical limitations was improper because the ALJ only credited the opinion of Dr. Jackson—a non-examining physician—when formulating this determination and rejected the opinion of Dr. Taylor—an examining physician.  Joint Stip. at 40.  Plaintiff argues "the opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  Id.  Consequently, Plaintiff concludes Dr. Jackson's opinion cannot support either the rejection of the opinion of Dr. Taylor or the RFC determination.  Id.

However, the Court found in Section VII.B.2. that the ALJ's rejection of Dr. Taylor's opinion was based on "clear and convincing reasons."  Carmickle, 533 F.3d at 1164.  Moreover, although Dr. Jackson was a non-examining physician, Plaintiff does not identify how Dr. Jackson's opinion was inconsistent with the medical record.  Hence, the Court rejects Plaintiff's argument.  See Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

45

1  (a claimant's assessed RFC is based upon all the relevant evidence in the case record).

2  "The ALJ is required to consider all of the limitations imposed by the claimant's

3  impairments, even those that are not severe."  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>,

4  533 F.3d 1155, 1164 (9th Cir. 2008) (citation omitted).  "Even though a non-severe

5  impairment[] standing alone may not significantly limit an individual's ability to do basic

6  work activities, it may – when considered with limitations or restrictions due to other

7  impairments – be critical to the outcome of a claim."  <u>Id.</u> (citation and internal quotation

8  marks omitted).  "[A]n RFC that fails to take into account a claimant's limitations is

9  defective."  <u>Valentine v. Comm'r Soc. Sec. Admin.</u>, 574 F.3d 685, 690 (9th Cir. 2009).

10 Where the ALJ's RFC determination is supported by substantial evidence and contains no

11 legal error, the Court may not second guess it.  See <u>Lindquist v. Colvin</u>, 588 F. App'x

12 544, 546 (9th Cir. 2014).

13      While an ALJ's RFC finding need not be identical to credible medical opinions, it

14 does need to be consistent with them.  See <u>Turner v. Comm'r of Social Sec.</u>, 613 F.3d

15 1217, 1223 (9th Cir. 2010) (accepting limitations that were "entirely consistent" with

16 physician's evaluation); <u>Chapo v. Astrue</u>, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here

17 is no requirement in the regulations for a direct correspondence between an RFC finding

18 and a specific medical opinion on the functional capacity in question.").

19      **2.      The ALJ's RFC Determination Regarding Plaintiff's Mental**

20          **Limitations Was Proper.**

21          **a.      The ALJ's RFC Determination Encompassed All Mental**

22                **Limitations Found By Dr. Garcia.**

23      Plaintiff argues the ALJ's RFC determination did not encompass mental limitations

24 noted by Dr. Garcia in his July 2011 "Mental Residual Functional Capacity Assessment"

25 evaluation form.  Joint Stip. at 33-34.  Specifically, Plaintiff argues the RFC

26 determination did not incorporate Dr. Garcia's findings in Section I of the form that

27 Plaintiff was "moderately limited" in the following seven abilities: (1) understand and

28 remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention

and concentration for extended periods; (4) perform activities within a regular schedule, maintain regular attendance, and be punctual within customary tolerances; (5) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; and (7) accept instructions and respond appropriately to criticism from supervisors.  Id.; see also AR at 383-84.

Plaintiff's references to Dr. Garcia's conclusions in Section I of the "Mental Residual Functional Capacity Assessment" form are selective.  Section I of the form pertained only to "summary conclusions."  See AR at 383.  That is, Section I allowed for an evaluator to summarily conclude whether and to what extent a claimant was limited in his or her capacity to perform a number of abilities.[16]  See id.  The form expressly directed the evaluator to provide a "detailed explanation of the degree of limitation for each category . . . in Section III" of the form.  Id.  In Section III of his evaluation, Dr. Garcia elaborated on his summary conclusions in Section I.  Dr. Garcia stated Plaintiff was limited to simple and repetitive tasks and would likely be able to maintain a regular work schedule, attention, concentration, and pace if he were "given less demanding work."  Id. at 385.  Dr. Garcia also noted Plaintiff would be able to have limited public interaction.  Id.  Lastly, Dr. Garcia stated that although Plaintiff was "moderately limited" in his ability to accept criticism from supervisors as per his summary conclusion in Section I, Dr. Garcia stated he would still be able to "respond satisfactorily" to such criticism and would be able to adapt.  Id.

The ALJ's RFC determination was consistent with and reflected Dr. Garcia's more detailed conclusions in Section III.  Incorporating Dr. Garcia's conclusions, the ALJ

---

[16]  The form allowed an evaluator to check boxes indicating whether the claimant was "not significantly limited," "moderately limited," or "markedly limited," in regard to each ability.  AR 383-84.  The form also allowed the evaluator to check boxes indicating there was no evidence of a limitation or that the claimant was not ratable based on the available evidence.  Id.

1   concluded Plaintiff could only perform "simple repetitive tasks requiring only limited

2   interaction with the general public." Id. at 29. Given that the ALJ incorporated Dr.

3   Garcia's more reasoned Section III opinions, the ALJ was not required to address each of

4   the individual limitations Dr. Garcia summarily selected in Section I of the form. See

5   Israel v. Astrue, 494 F. App'x 794, 796-97 (9th Cir. 2012) (rejecting argument that "ALJ

6   erred by relying on [doctor's] narrative assessment in her Section III, Functional Capacity

7   Assessment, of [plaintiff's] Mental Residual Function Capacity Assessment (MRFCA)

8   and not individually weighing the limitations she identified in each checked box of her

9   Section I, Summary Conclusions"). Hence, the ALJ's RFC determination was proper.

10            **b.      The ALJ's RFC Determination Incorporated Her Finding**

11                    **Plaintiff Had Moderate Difficulties in His Concentration,**

12                    **Persistence, or Pace.**

13          Plaintiff argues the ALJ's RFC determination was incomplete because it did not

14   encompass the ALJ's prior finding that Plaintiff had "moderate difficulties" with regard

15   to "concentration, persistence, or pace." Joint Stip at 34-38. In particular, Plaintiff

16   contends the ALJ's statement in the RFC determination that Plaintiff could perform "only

17   simple, repetitive tasks" did not encompass the ALJ's prior finding regarding Plaintiff's

18   moderate difficulties with regard to "concentration, persistence, or pace." Id.

19                            **(i)      Applicable Law**

20          The Ninth Circuit has held "an ALJ's assessment of a claimant adequately captures

21   restrictions related to concentration, persistence, or pace where the assessment is

22   consistent with restrictions identified in the medical testimony." Stubbs-Danielson v.

23   Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). In Stubbs–Danielson, the Ninth Circuit

24   addressed a record containing some evidence of the claimant's slow pace, but where the

25   only "concrete" functional limitation provided by medical sources was a medical source

26   opinion that, despite that slow pace, the claimant could perform "simple tasks." Id. at

27   1173-74. The ALJ issued an RFC determination limiting the plaintiff to "simple, routine,

28   repetitive sedentary work." Id. at 1173. The ALJ relied on: (1) one doctor who

48

acknowledged the claimant had pace deficiencies, but opined that the claimant could perform unskilled work anyway; and (2) another doctor's opinion that the claimant was "not significantly limited" in her ability to "maintain attention and concentration for extended periods" and "sustain an ordinary routine without special supervision." Id. Because the Ninth Circuit concluded the ALJ's RFC determination was consistent with both doctors' opinions, the Ninth Circuit held the ALJ did not err in posing hypothetical questions to the vocational expert.  Id.

In subsequent unpublished opinions,[17] the Ninth Circuit has held that when an ALJ finds a moderate limitation in concentration, persistence, or pace, the ALJ must include that limitation in the claimant's RFC and in the ALJ's questions to the vocational expert. See, e.g., Lubin v. Comm'r of Soc. Sec. Admin., 507 F. App'x 709, 712 (9th Cir. 2013) (finding that the ALJ's limitation of a claimant to one to three step tasks did not capture the ALJ's finding that the claimant had moderate limitations in concentration, persistence or pace); Brink v. Comm'r of Soc. Sec. Admin., 343 F. App'x. 211, 212-13 (9th Cir. 2013); Williamson v. Comm'r Soc. Sec., 438 F. App'x 609, 611 (9th Cir. 2011).

However, in Sabin v. Astrue, the Ninth Circuit indicated there are circumstances where an ALJ may simply note a claimant is limited to simple and repetitive tasks in an RFC finding, even after previously determining the claimant suffers difficulties with concentration, persistence, or pace.  337 F. App'x 617, 620 (9th Cir. 2009).  In Sabin, the claimant argued "the ALJ found she had moderate difficulties in concentration, persistence, or pace yet failed to account for these in the [RFC] finding" and instead only noted the claimant was limited to simple and repetitive tasks.  Id.  The Ninth Circuit rejected the claimant's argument.  Id.  The Ninth Circuit reasoned the ALJ's RFC finding

---

[17]   Ninth Circuit Rule 36-3(b) provides: "Unpublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."  However, Ninth Circuit Rule 36-3(a) provides: "Unpublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."

1    "determined the end result of [the claimant's] moderate difficulties as to concentration,

2    persistence, or pace was that she could do simple and repetitive tasks on a consistent

3    basis." Id.  The Ninth Circuit noted this finding was consistent with the medical record:

4    several doctors had opined that the claimant, while limited in concentration, persistence,

5    or pace, could still perform simple and repetitive tasks.  Id. at 621.  Hence, the Ninth

6    Circuit found the ALJ's RFC determination adequately captured the tasks the claimant

7    could perform, notwithstanding her restrictions in concentration, persistence, or pace.  Id.

8                              **(ii)    Analysis**

9          Here, as in Sabin, the ALJ found Plaintiff had "moderate difficulties" with regard

10   to "concentration, persistence, or pace."  AR at 29.  Nonetheless, in her RFC

11   determination, the ALJ noted Plaintiff could perform "simple, repetitive tasks."  Id.  The

12   ALJ's findings were supported by Dr. Garcia's responses on "Psychiatric Review

13   Technique" and "Mental Residual Functional Capacity Assessment" forms, dated July 6,

14   2011.  See id. at 372-85; see also id. at 31 (noting the ALJ credited the opinion of Dr.

15   Garcia in his July 2011 evaluation).  Specifically, on the "Psychiatric Review Technique"

16   form, Dr. Garcia checked a box stating Plaintiff was "moderately" limited in

17   "maintaining concentration, persistence, or pace."  Id. at 380.  In the accompanying

18   "Mental Residual Functional Capacity Assessment" form, Dr. Garcia elaborated on this

19   conclusion by finding Plaintiff was limited to simple and repetitive tasks and would

20   likely be able to maintain a regular work schedule, attention, concentration, and pace if he

21   were "given less demanding work."  Id.

22         The Court finds Sabin and Stubbs-Danielson instructive here.  Given Dr. Garcia's

23   statements on the July 6, 2011 "Mental Residual Functional Capacity Assessment," the

24   Court finds the ALJ's RFC determination adequately captured the tasks Plaintiff could

25   perform.  Although the ALJ found Plaintiff suffered from moderate difficulties in

26   concentration, persistence, or pace, the ALJ properly concluded "the end result of

27   [Plaintiff's] moderate difficulties . . . was that [he] could do simple and repetitive tasks on

28   a consistent basis."  Sabin, 337 F. App'x at 620.  As in Sabin, the ALJ's determination

1  was supported by Dr. Garcia's conclusions that Plaintiff, despite his problems with

2  concentration persistence, or pace, was still able to perform simple and repetitive tasks.

3  Hence, the Court concludes the ALJ properly translated Plaintiff's moderate limitations

4  with respect to concentration, persistence or pace into a limitation to performing "simple,

5  repetitive tasks" in the RFC.

6        **c.**     **The ALJ Properly Found Plaintiff Would Not Suffer Possible**

7                 **Decompensation in The Workplace and Properly Assessed**

8                 **Plaintiff's RFC.**

9        Plaintiff challenges the ALJ's finding that Plaintiff "experienced no episodes of

10  decompensation, which have been of extended duration."  Joint Stip. at 38-39; see also

11  AR at 29.  Plaintiff argues his medical records show he has had prior suicide attempts,

12  episodes of suicidal ideation, and was admitted in 2010 into the Hillmont Psychiatric Unit

13  at Ventura County Medical Center because of suicidal ideation.  Joint Stip. at 38-39.

14  Plaintiff also appears to argue his medical records show "he has suicidal ideation when

15  under stress and that a main stressor in his life is the fear of having to face the workplace

16  again."  Id. at 39.  Hence, Plaintiff concludes the ALJ's RFC determination should have

17  included a finding of possible decompensation in the workplace.  Id.

18        Federal regulations define "episodes of decompensation" as "exacerbations or

19  temporary increases in symptoms or signs accompanied by a loss of adaptive functioning,

20  as manifested by difficulties in performing activities of daily living, maintaining social

21  relationships, or maintaining concentration, persistence, or pace . . . .  Episodes of

22  decompensation may be inferred from medical records showing significant alteration in

23  medication; . . . or other relevant information in the record about the existence, severity,

24  and duration of the episode."  20 C.F.R. § 404, Subpart. P, App. 1, § 12.00.C.4.

25  "Episodes of extended duration" means "three episodes within 1 year, or an average of

26  once every four months, each lasting for at least 2 weeks."  Id.

27        Here, Plaintiff has failed to show the ALJ's finding that he did not suffer episodes

28  of decompensation for an extended duration was erroneous.  Plaintiff cites no evidence

1    suggesting he suffered three episodes of decompensation for two weeks, each year.  See
2    20 C.F.R. § 404, Subpart. P, App. 1, § 12.00.C.4.  Although Plaintiff raises the fact that
3    he was admitted to the Hillmont Psychiatric Unit at Ventura County Medical Center for
4    ten days in 2010, this does not establish he suffered episodes of decompensation for an
5    extended duration, under federal regulations.  Furthermore, although Plaintiff cites
6    instances in the medical record showing he suffered from suicidal ideation, these
7    instances do not amount to "episodes of decompensation" under federal regulations.
8    Rather, as the ALJ found when determining Plaintiff's RFC, Plaintiff's treatment records
9    indicate his mental health improved after his hospitalization in 2010 as he gained
10   treatment and took medication.  See AR at 337-39, 429-30, 433, 437.

11        In any case, whether Plaintiff suffered episodes of decompensation related not to
12   the ALJ's RFC determination, but rather to the ALJ's Step Two determination as to
13   whether Plaintiff's mental impairments were severe, as well as to the Step Three analysis.
14   20 C.F.R. §§ 404.1520a and 416.920a require the ALJ to engage in a psychiatric review
15   technique assessing a claimant's limitations and restrictions from a mental impairment in
16   categories identified as the "paragraph B" and "paragraph C" criteria of the adult mental
17   disorders listings.  SSR 96–8P, 1996 WL 374184, at *4; 20 C.F.R. §§ 404.1520a,
18   416.920a.  "Episodes of decompensation" are one of the four components of the
19   paragraph B criteria.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.  However, SSR 96–8P
20   expressly provides, "[t]he adjudicator must remember that the limitations identified in the
21   'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate
22   the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation
23   process."  SSR 96–8P, 1996 WL 374184, at *4.  Federal regulations also explain that:

24             RFC is a multidimensional description of the work-related
              abilities you retain in spite of your medical impairments. An
25            assessment of your RFC complements the functional evaluation
              necessary for paragraphs B and C of the listings by requiring
26            consideration of an expanded list of work-related capacities that
              may be affected by mental disorders when your impairment(s)
27            is severe but neither meets nor is equivalent in severity to a
              listed mental disorder.
28

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A.

Citing these regulations, numerous courts have held the determination of a claimant's RFC is distinct from the examination of the degree of functional limitation that takes place when assessing whether a claimant's impairment is "severe" at Step Two or whether it meets a listing at Step Three.  See, e.g., Coleman v. Astrue, No. 07-CV-1722-JM (JMA), 2009 WL 861864, at *11 (S.D. Cal. Mar. 26, 2009) (rejecting challenge to ALJ's RFC determination predicated on the failure to include episodes of decompensation); Langford v. Astrue, No. CIV S-07-0366 EFB, 2008 WL 2073951, at *3 (E.D. Cal. May 14, 2008) (finding that the ALJ was under no obligation to incorporate the findings from the psychiatric review technique in his ultimate assessment of plaintiff's RFC at steps four and five); see also Lopez v. Astrue, No. C 07-2649 PJH, 2008 WL 3539623, at *7 (N.D. Cal. Aug. 12, 2008) (same).  Thus, Plaintiff's challenge to the ALJ's RFC determination based on the ALJ's failure to find episodes of decompensation is not cognizable.

Hence the Court concludes the ALJ did not commit error by not including episodes of decompensation in her determination of Plaintiff's RFC.

### d.    The ALJ's RFC Determination Was Consistent With Dr. Case's Opinion.

Plaintiff argues the ALJ's RFC determination regarding his mental limitations improperly excluded mental limitations found by examining state agency medical consultant Dr. Case in a January 2011 evaluation.  Joint Stip. at 13.  In her evaluation, Dr. Case concluded Plaintiff: (1) was capable of performing one or two simple repetitive tasks on a regular basis; (2) was not impaired in the ability to accept instructions or interact with coworkers; (3) could perform work activities on a consistent basis; and (4) was able to maintain regular attendance in the workplace.  AR at 290.  According to Dr. Case, Plaintiff only had two functional limitations: (1) he was not capable of handling his funds in his own best interest; and (2) he would have difficulty dealing with the usual stress encountered in the workplace.  Id.  However, Dr. Case noted she believed

1   Plaintiff's mental health problems would abate within twelve months.  Id.  Plaintiff

2   claims the ALJ erred in failing to evaluate Dr. Case's opinion and in failing to include

3   Plaintiff's alleged "difficulty dealing with the usual stress encountered in the workplace"

4   in the RFC finding.  Joint Stip. at 33.

5       The Court holds the ALJ's RFC finding was proper.  Although the ALJ did not

6   credit or assess Dr. Case's evaluation in her decision, the ALJ's RFC determination was

7   consistent with it.  See Turner, 613 F.3d at 1223 (accepting limitations that were "entirely

8   consistent" with physician's evaluation).  Dr. Case did not opine Plaintiff had any

9   functional limitations resulting from his alleged "difficulty dealing with the usual stress

10  encountered in the workplace."  AR at 290.  Rather, Dr. Case stated Plaintiff would be

11  able to perform work activities on a consistent basis, could maintain regular attendance,

12  and would be able to perform one or two simple repetitive tasks on a daily basis.  Id.  The

13  RFC determination, by contrast, found Plaintiff suffered from *greater* limitations than

14  those noted by Dr. Case: the RFC determination stated Plaintiff was limited to

15  performing *only* "simple, repetitive tasks."  Id. at 29.  Hence, the RFC determination was,

16  at the very least, consistent with Dr. Case's opinion and was therefore proper.  See

17  Turner, 613 F.3d at 1223.

18      Moreover, to the extent the ALJ erred in failing to evaluate Dr. Case's opinion, the

19  Court finds any error was harmless because the ALJ's RFC determination ultimately

20  contained greater limitations than those set forth by Dr. Case.  See Stout v.

21  Commissioner, Social Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) ("We have ...

22  affirmed under the rubric of harmless error where the mistake was nonprejudicial to the

23  claimant or irrelevant to the ALJ's ultimate disability conclusion"); see also

24  Keyes–Zacharty v. Astrue, 695 F.3d 1156, 1161–66 (10th Cir. 2012) (discussing several

25  instances where the ALJ failed to specify the weight given to medical opinions and

26  finding them to be harmless error).

27      **3.    The ALJ's RFC Determination Regarding Plaintiff's Physical**

28          **Limitations Was Proper.**

54

1
2

      **a.    The ALJ's RFC Determination Properly Did Not Include Physical Limitations Relating to Plaintiff's Obesity.**

3        Plaintiff argues the ALJ's RFC determination was incomplete because it did not

4 include or discuss physical limitations arising from Plaintiff's obesity.  Joint Stip. at 41-

5 42.  In support, Plaintiff cites Dr. Taylor's December 2010 internal medicine consultative

6 examination of Plaintiff.  Id.  Plaintiff cites the fact that Dr. Taylor determined Plaintiff

7 was 6'1" tall and weighed 250 pounds.  Id.  Plaintiff argues these measurements

8 established he had a Body Mass Index ("BMI") of 32.1.  Id.  Plaintiff contends this BMI

9 classifies him as obese, according to Social Security Ruling ("SSR") 02-1p.  Id.

10      In support, Plaintiff relies on Celaya v. Halter, 332 F.3d 1177, 1182 (9th Cir.

11 2003), which held that an ALJ should have considered obesity as a disabling factor in the

12 sequential analysis, even though it was not explicitly raised by the claimant, because: (1)

13 obesity was raised implicitly in the claimant's report of symptoms, (2) the claimant's

14 obesity was at least close to the listing criterion and was a condition that could exacerbate

15 other reported impairments; and (3) the claimant's lack of representation should have

16 alerted the ALJ to the need to develop the record further.  Id. at 182.

17      Celaya's reach, however, was limited by the Ninth Circuit's subsequent decision in

18 Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).  In Burch, the Ninth Circuit held an

19 ALJ's failure to consider obesity at Step Two was not error where there was no evidence

20 that claimant's obesity exacerbated other impairments.  400 F.3d at 682.  In addition, the

21 Ninth Circuit found no reversible error in the ALJ's RFC determination because there

22 was no evidence in the claimant's records of any functional limitations due to obesity that

23 the ALJ failed to consider.  Id. at 684.  In reaching its holding in Burch, the Ninth Circuit

24 expressly distinguished Celaya, noting the claimant was represented by counsel.  Id. at

25 682.

26      In subsequent unpublished decisions, the Ninth Circuit has repeatedly re-affirmed

27 Burch's holding that an ALJ's failure to consider a claimant's obesity in an RFC

28 determination does not constitute reversible error where there is no evidence in the record

1  showing the obesity resulted in any functional limitations.  See Garcia v. Comm'r of

2  SSA, 498 F. App'x. 710, 712 (9th Cir. 2012) (holding the ALJ's finding that obesity did

3  not impact the RFC was proper where the Plaintiff "did not provide any evidence of

4  functional limitations due to obesity which would have impacted the ALJ's analysis")

5  (internal quotation marks omitted); Burton v. Astrue, 310 F. App'x 960, 961 n.1 (9th Cir.

6  2009) (rejecting argument ALJ did not adequately consider obesity in RFC determination

7  where claimant "did not specify how his obesity limit[ed] his functional capacity, or how

8  it exacerbate[d] his currently existing condition"); Hoffman v. Astrue, 266 F. App'x 623,

9  625 (9th Cir. 2008) ("The ALJ's failure to consider [claimant]'s obesity in relation to his

10 RFC was proper because [claimant] failed to show how his obesity in combination with

11 another impairment increased the severity of his limitations.").

12       Here, the Court finds Burch and subsequent unpublished decisions controlling.  As

13 an initial matter, the Court notes that, as in Burch, Plaintiff was represented by counsel

14 throughout the proceedings before the ALJ.  See AR at 23.  Moreover, Plaintiff does not

15 cite and the Court cannot find any evidence in the medical record or Plaintiff's own

16 testimony before the ALJ showing Plaintiff was in any way functionally limited by his

17 obesity.  To the contrary, Plaintiff does not appear to have raised limitations related to his

18 obesity during the proceedings before the ALJ.  See Avila v. Astrue, No. 1:09-CV-

19 02139-SMS, 2011 WL 2636119, at *6 (E.D. Cal. July 5, 2011) ("To require an ALJ to

20 address obesity when the claimant did not raise the issue before him would eviscerate the

21 claimant's burden of proving a medically determined impairment.").  Furthermore, Dr.

22 Taylor's December 2010 evaluation – upon which Plaintiff now relies for evidence of his

23 obesity – did not note *any* physical limitations arising from Plaintiff's apparent obesity.

24 See AR at 285-86.  Hence, the ALJ did not err in failing to consider the physical

25 limitations of Plaintiff's obesity in the RFC determination.  See Burch, 400 F.3d at 684

26 ("Burch has not set forth, and there is no evidence in the record, of any functional

27 limitations as a result of her obesity that the ALJ failed to consider.").

28

**b.     The ALJ's RFC Determination Properly Did Not Include Physical Limitations Relating to Plaintiff's Migraine Headaches.**

When challenging the ALJ's RFC determination in regard to Plaintiff's physical limitations, Plaintiff also appears to challenge the ALJ's finding at Step Two that Plaintiff's migraine headaches were not a severe impairment.  Joint Stip. at 40-41.  The ALJ concluded Plaintiff's "medical records did not reflect the type of frequency of complaints one would expect if the headaches more than minimally affected the [Plaintiff's] ability to perform work related activities."  AR at 28.  In particular, the ALJ noted Plaintiff's health care providers made no mention in August 2010 of uncontrolled migraines or headaches nor did Plaintiff report any headaches to Dr. Taylor when she evaluated him in December 2010.  Id.  Because the ALJ found "there was essentially no recent treatment for migraine headaches," the ALJ concluded these headaches were "not as bothersome or disruptive to daily activities" as Plaintiff alleged.  Id.

Plaintiff argues the ALJ's Step Two finding was erroneous.  Joint Stip. at 40-41. In support, Plaintiff cites portions of the medical record noting he had a history of migraine headaches.  Id. at 40 (citing AR at 245-47, 276-78, 334, 338-40, 343, 346, 348-51, 354, 356, 358, 364, 410, 417-19, 426, 429-30, 432-33, 435, 437, 438, 450, 452-54, 456, 458-59, 461-65, 467-70, 473, 475-77).  In particular, Plaintiff states Dr. Case's January 2011 evaluation noted Plaintiff had a history of migraine headaches.  Id. at 41 (citing AR at 288).  The Commissioner contends and the Court agrees that Plaintiff's Step Two challenge is moot given the ALJ found Plaintiff had other impairments that were severe and considered all of Plaintiff's impairments at the other steps of the sequential analysis.  See AR at 25; see also Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (any error in omitting an impairment from the severe impairments identified at Step Two was harmless when Step Two was resolved in claimant's favor).

To the extent Plaintiff claims the ALJ's RFC determination did not properly account for limitations arising from Plaintiff's migraine headaches, the Court rejects this argument.  Plaintiff does not specify what functional limitations he suffered as a result of

his migraine headaches.  Moreover, while Plaintiff cites portions of the record noting he suffered from migraine headaches or stating Plaintiff's reports of such headaches, *none* of the treating or consultative physicians found Plaintiff suffered *any* functional limitations as a result of these migraine headaches.  Hence, the Court concludes the ALJ's RFC determination was supported by substantial evidence.  See Lindquist, 588 F. App'x at 546.

**D.     The ALJ Properly Rejected the Third Party Written Statements.**

Plaintiff argues the ALJ improperly rejected the third party written statements of Plaintiff's sister, Ann Bernstein, and Plaintiff's homeless shelter case manager, Kalie McCormack.  Joint Stip. at 54-56.

**1.     Applicable Law**

"An ALJ need only give germane reasons for discrediting the testimony of lay witnesses."  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (citation omitted). While an ALJ need not discuss each piece of lay testimony "on a[n] individualized, witness-by-witness basis," the ALJ must at least explain the "reasons for disregarding the lay witness testimony . . . in the aggregate."  Molina, 674 F.3d at 1115.  "[A]n ALJ's failure to comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting the claimant's claims also discredits the lay witness's claims."  Id. at 1122 (citation, internal quotation marks, and alterations omitted).

**2.     The ALJ's Decision**

In her decision, the ALJ stated she gave "little weight" to the third party written statement of Plaintiff's sister, Ann Bernstein, regarding Plaintiff's suicide attempts.  AR at 31.  The ALJ noted Plaintiff's sister lived out of state and did "not have knowledge of the specifics of the [Plaintiff's] condition."  Id.  Ultimately, the ALJ stated she found Plaintiff's treatment notes to be more probative of Plaintiff's actual condition than Plaintiff's sister's statements.  Id.

The ALJ also appeared to give little weight to the third party written statement of Kalie McCormack, Plaintiff's Case Manager at a homeless shelter where he was

58

1   temporarily housed.  Id.  While the ALJ acknowledged that Plaintiff's Case Manager

2   reported Plaintiff continued to experience some depression even after seeking treatment,

3   the ALJ concluded Dr. Groot and Dr. Anderson's treatment notes, which showed Plaintiff

4   was doing well after taking medication, were entitled to "greater weight."  Id.

5          **3.      Analysis**

6          Plaintiff contends the ALJ did not provide sufficient reasons justifying rejection of

7   either Bernstein or McCormack's statements.  Joint Stip. at 55.  Plaintiff claims the ALJ's

8   sole ground for rejecting both statements was that they were inconsistent with Dr. Groot

9   and Dr. Anderson's treatment notes.  Id.  Citing SSR 96-7p, Plaintiff argues third party

10  statements "may not be disregarded solely because they are not substantiated by objective

11  medical evidence."  Id.

12         The Court holds the ALJ's rejection of Bernstein's statement was proper.  The ALJ

13  stated she gave less weight to Bernstein's statement because Bernstein lived out of state

14  and did not have knowledge of Plaintiff's day-to-day condition.  AR at 31.  Such

15  reasoning was corroborated by Bernstein's own remarks in the third party statement that

16  she did not know details regarding Plaintiff's daily affairs, such as whether he shopped,

17  prepared his own meals, or performed household chores.  Id. at 196-98.  The ALJ's

18  assignment of less weight to Bernstein's statement on such grounds was proper.  See

19  Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996) (holding ALJ's rejection of lay

20  testimony proper where "the record does not show that [the witness] had sufficient

21  contact with [the claimant] during the relevant time to qualify as a competent lay

22  witness").  Hence, the ALJ provided "germane reasons" for discrediting Bernstein's

23  statement.  Bayliss, 427 F.3d at 1218.

24         The Court holds the ALJ also properly rejected McCormack's statements.

25  Plaintiff's argument to the contrary notwithstanding,[18] the Ninth Circuit has expressly

26  _____

27         [18]   Plaintiff's citation to SSR 96-7p is misplaced.  SSR 96-7p does not state an ALJ
    may not reject lay testimony simply because it is inconsistent with the medical record.
28  Rather, SSR 96-7p states a *claimant's* "statements about the intensity and persistence of

                                              59

1  held "inconsistency with medical evidence" constitutes a "germane reason" justifying
2  rejection of lay testimony.  <u>Bayliss</u>, 427 F.3d at 1218.  Here, the ALJ acknowledged
3  McCormack's claims that Plaintiff suffered from depression, but apparently gave them
4  less weight because Dr. Groot and Dr. Anderson's treatment notes showed Plaintiff's
5  depression improved after medication and treatment.  AR at 31.  Under <u>Bayliss</u>, the
6  inconsistency of McCormack's statements with these treatment notes constituted a
7  "germane reason" for giving these statements less weight.  <u>Bayliss</u>, 427 F.3d at 1218.
8  Accordingly, the Court concludes the ALJ did not err in giving McCormack's statements
9  less weight.

**VIII.**

**<u>CONCLUSION</u>**

12       IT IS THEREFORE RECOMMENDED that the Court issue an Order (1) accepting
13  this Final Report and Recommendation; (2) affirming the Commissioner's decision; and
14  (3) dismissing this action with prejudice.

16  DATED: June 11, 2015

17                              HON. KENLY KIYA KATO
                              United States Magistrate Judge

_____

27  pain or other symptoms or about the effect the symptoms have on his or her ability to
    work may not be disregarded solely because they are not substantiated by objective
28  medical evidence."